FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 1 2 2010

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| WILLIAM P. CREASMAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DISH NETWORK, L.C.C., a Colorado Limited Liability Company, DISH DBS CORPORATION and DISH NETWORK CORPORATION,<br><br>Defendants. | ___ Civ. ____<br>**4·10-CV-0392 JMM**<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>This case assigned to District Judge *Moody*<br>and to Magistrate Judge *Deere* |

Plaintiff individually and on behalf of others similarly situated, complains against defendants (collectively, "Defendants"), upon personal knowledge as to himself and own acts, and as to all other matters upon information and belief, based upon, *inter alia,* the investigation made by their attorneys, as follows:

## OVERVIEW OF THE ACTION

1.    Plaintiff brings this action individually and on behalf of proposed class of persons who were injured by Defendants' business acts and practices in (1) extending contracts automatically without customer request whenever a customer requests an upgrade or other service change; and (2) imposing unconscionable early termination fees (ETFs) upon customers which, even if not charged to any customer, coerce customers to avoid canceling the service or switching service to other providers.

2.    Since at least 2008, according to published reports, the Federal Communications Commission has been investigating termination fees in the wireless, cable and satellite industries, however it has focused its efforts on the wireless industry first. Thus, customers of satellite television providers have been left to the mercy of providers as detailed herein.

3.    In 2009, the Attorneys Generals of 46 states, including Arkansas, acted on the multitude of complaints by customers of Dish and initiated an investigation of Dish's marketing, early termination fees, third party retailers, and servicing activities. The concerted actions of the 46 state Attorneys General resulted in an agreement by Dish to comply with the states consumer laws and to provide restitution to a narrow slice of Dish customers. *See* Exhibit A - Assurance of Voluntary Compliance ("AVC"). This class action is on behalf of all the DISH customers aggrieved by defendants' conduct who were omitted from the DISH customers who were allowed to seek restitution form DISH pursuant to the AVC.

4.    Through a uniform scheme and common course of conduct, Defendants (1) automatically re-enrolled plaintiffs and other subscribers for extended terms without their knowledge, consent or permission; (2) misrepresented the terms of its service; and (3) kept plaintiff enrolled as a subscriber by imposing the threat of an unreasonable and excessive early termination fee for cancellation of their service before the end of the "service plan" term, regardless of the reason(s) for cancellation; and (4) imposed unreasonable and coercive early termination fees on customers who canceled their service.

5.      As alleged herein, Defendants' conduct gives rise to Plaintiff' claims for: (1) violations of the Federal Communications Act; (2) violations of Colorado Consumer Protection Act; (3) unjust enrichment, (4) breach of contract, and (5) declaratory relief pursuant to 28 U.S.C. § 2201; and (5) injunctive relief.

## JURISDICTION AND VENUE

6.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and jurisdiction pursuant to 28 U.S.C. § 1332(d). This is a class action involving more than 100 class members. At least one member of the class is a citizen of a State different from Defendants, and the amount in controversy, in the aggregate, exceeds the sum of $5,000,000.00 exclusive of interests and costs.

7.      Venue is proper under 28 U.S.C. § 1391. Plaintiff resides in this District and the service offered by Defendants was provided to Plaintiff in Arkansas. Defendants conduct substantial business in this District and in the State of Arkansas and transact business, committed an illegal act in, maintain agents or representatives in, or are found in this District. Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

## PARTIES

8.      Plaintiff William P. Creasman is a citizen of Arkansas and contracted for Defendants' direct broadcast satellite TV service in Arkansas as alleged herein.

9.      Defendant Dish Network Corporation ("DNC") is the nation's third largest pay-TV provider. DNC was organized in 1995 as a corporation under the laws of the State of Nevada and started offering Dish Network subscription television services in March 1996.

10.    Defendant Dish DBS Corporation ("Dish DBS") is a Nevada Corporation wholly owed by DNC.  Dish DBS owns Dish LLC.

11.    Defendant Dish Network LLC ("Dish LLC") is a limited liability company 100 percent owned and controlled by Dish DBS Corporation which contracts with subscribers such as Plaintiff for direct satellite TV services.

12.    Defendants Dish DBS and Dish LLC are under the common control and ownership of DNC, all of which are located at 9601 South Meridian Boulevard, Englewood, Colorado.  Defendants do not maintain a registered agent for service of process in Arkansas, but may be served with process through the Arkansas Secretary of State, Legal Division, State Capitol, Room 256, Little Rock, Arkansas 72201, or at their place of business located at 9601 South Meridian Boulevard, Englewood, Colorado 80112.

## SUBSTANTIVE ALLEGATIONS

13.    DNC is the nation's third largest provider of video and audio programming services to subscribers via direct broadcast satellites, with approximately 13.6 million customers across the United States as of December 31, 2008.  Dish sells and leases equipment to allow access to such programming transmitted from satellites through its subsidiaries, Defendants Dish LLC and Dish DBS Corporation, and charges monthly fees for the programming services subscribed to by its customers.

14.    DNC's business model is designed to increase the likelihood of customers keeping their Dish Network service over longer periods of time.  DNC actively seeks to extend existing contracts for additional periods to enhance its operating results.

15.   DNC handles customer service calls through internally-operated and outsourced customer service centers to market, promote, and solicit orders from Consumers for the purchase of DISH Network Goods and/or DISH Network Services and/or to provide installation and activation services to Consumers in connection with their purchase of DISH Network Goods and/or DISH Network Services.

16.   Dish customers have lodged numerous complaints against DISH Network that DISH and its agents ("Third-Party Retailers") have made misrepresentations and material omissions of fact in connection with their marketing, promotion and sale of DISH Network Goods and/or DISH Network Services and that DISH Network has represented to Class Members that it is not responsible for the conduct of its Third-Party Retailers. DISH Network's Third-Party Retailers, with DISH Network's assent, are acting on DISH Network's behalf as its agents and are subject to DISH Network's control.

17.   Dish admits that it fails to exercise proper control over its agents. In its 2008 Annual Report filed on Form10-K with the Securities and Exchange Commission, Dish admits:

> We have not always met our own standards for performing high quality installations, _effectively resolving customer issues when they arise_, answering customer calls in an acceptable timeframe, _effectively communicating with our customer base_, reducing calls driven by the complexity of our business, improving the reliability of certain systems and customer equipment, and _aligning the interests of certain third party retailers and installers to provide high quality service_.

[Emphasis supplied].

18.   DNC and its subsidiaries, including all Defendants herein are subject to comprehensive regulation by the FCC as well as the individual states of the United States.   The Communications Act gives the FCC broad authority to regulate the operations of satellite companies.   Specifically, the Communications Act gives the FCC regulatory jurisdiction over ensuring compliance with applicable provisions of the Communications Act and FCC.   In addition, Dish contracts provide that Colorado law shall apply to its agreements with its customers that include the Colorado Consumer Protection Act.

19.   Among the complaints lodged most frequently by Dish customers regarding the Dish Network:  Dish and its authorized retailers would offer big packages with discounts for a two-year commitment from consumers and then boost the price and/or reduce service.   Consumers who then wanted to cancel their service were told they would face hundreds of dollars in cancellation penalties.   Defendants' use of cancellation penalties is unfair, coercive and unconscionable.   Dish also was accused of drawing payment from customers' bank accounts and credit cards without proper warning or authorization and violation Do-Not-Call telemarketing laws.   Also, customers complained they were not informed that their premium sports packages were subject to blackout and they might not receive their local TV stations.

20.   Defendants not only purport to obligate their customers to extended terms of service at the beginning of service, they also attempt at various points to extend those terms of enforced commitment even further during the 24-month term of initial commitment.   For example, during their terms of service, customers may contact Defendants about malfunctioning equipment or services.   In such instances, Defendants

will repair or replace the equipment or adjust service. When they do so, Defendants and or their agents, the Third Party Retailers, will "commit" the customer to an additional term of service of up to 24 months. Additionally, when a customer adds an additional receiver to a home that already had Defendants' equipment, or upgrades to a different type of receiver, Defendants will obligate the customer to new additional term of service of up to 24 months.

21.     For years, the attorney generals of the states of Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming (hereinafter referred to as the "Attorneys General") have been monitoring complaints against Dish. Eventually the Attorneys General took action against Dish and resolved a small fraction of Dish customers problems with Dish through the AVC.

22.     In the AVC, Attorneys General assert that "DISH Network controls the conduct, practices and procedures of its Third-Party Retailers through its DISH Network Retailer Agreement, or similar documents; through "Business Rules" that are established by DISH Network and must be followed by Third Party Retailers; through training that DISH Network provides to its Third-Party Retailers; by requiring Third-Party Retailers to take all actions and refrain from taking any action as reasonably requested by DISH Network in connection with marketing, advertising, promotion and/or solicitation of

orders; by requiring Third-Party Retailers to market, promote and describe DISH Network Goods and/or DISH Network Services in a manner approved by DISH Network; by setting all prices for its programming and related promotions and limiting its Third-Party Retailers' ability to offer and sell other goods and services to DISH Network's customers; by requiring Third-Party Retailers to perform installation services consistent with guideline set forth in DISH Network's Installation Manual; and by requiring Third-Party Retailers to use DISH Network's trademarks, logos and service marks in connection with the retail sale of DISH Network Goods and/or DISH Network Services and otherwise controlling their appearance and conduct when interacting with consumers."

23.    The AVC provided relief to only a small subset of Dish customers.  This class action seeks relief for Dish customers who were not included in the AVC.

24.    In the AVC, Dish agreed to pay restitution and/or other appropriate relief only to Consumers who had previously made a written complaint which (i) was received by DISH Network and/or one of the Attorneys General and/or any other state agency located in one of the signatory Attorney General's states handling Consumer complaints between January 1, 2004, and the date of the entry of the AVC (*i.e.*, June 23, 2009), and the complaint remains either fully or partially unresolved; or (ii) was received by DISH Network, either directly from a Consumer or through a third party such as an Attorney General's Office, any state Consumer complaint-handling agency or Better Business Bureau, within one hundred and fifty (150) days from June 23, 2009 (*i.e*, November 23, 2009), the date of the entry of the AVC and concerns conduct that occurred during the two-year period to the date of the AVC.

25.     By its terms, the AVC does not (1) constitute a settlement and/or release of any claims, cause of action, damages, restitution, fines, costs, attorneys' fees and/or penalties arising from any acts, issues, policies or practices which relate in any way to or are based upon DISH Network unilaterally altering, directly or through any Third-Party Retailers, the terms of any Agreement without the express written consent of the Consumer with whom it entered the Agreement, including, but not limited to, any alteration in any terms concerning programming or pricing in any long-term contracts, or which relate to or are based upon the inclusion in DISH Network's Agreement of any provision that permits its unilateral alteration, directly or through any Third-Party Retailers, of the terms of the any Agreement concerning the purchase and/or lease of DISH Network Services and/or DISH Network Goods; (2) affect, restrict, limit, waive or alter any private right of action that a Consumer may have against DISH Network.

### Plaintiff's Experience With DISH

26.     Plaintiff contracted with DISH on or about December 19, 2007.

27.     When Plaintiff selected DISH as his television service provider, it was represented, inter alia, that the service included local channels in high-definition format ("HD").

28.     Defendants offer their products and services with various time commitments.  Their programming package commitments are currently for 24 months.

29.     Plaintiff never received the HD service.

30.     On or about February 12, 2009, plaintiff contacted DISH for a service call.

31.     Plaintiff accepted the service call and received the HD service he had been promised when he originally contracted with DISH in 2007.

32.   DISH unjustifiably treated the service call as a service upgrade and automatically extended plaintiff's service for a two year period scheduled to end February 12, 2011 without plaintiff's consent.

33.   Plaintiff would have, but for the termination penalty, cancelled his service with DISH and/or allowed the original term to expire without renewal thereof. Plaintiff did not knowingly choose to extend his service with DISH and would not have so extended it had full disclosure been made to plaintiff. Plaintiff only discovered that his contract had been extended by DISH on or about December 19, 2009, at the conclusion of his original contract term and when he sought to move his service from DISH to a service provider that competes with DISH.

34.   Defendants require customers to commit to, and   abide by, standard customer service agreements ("Agreements") which are contracts of adhesion because Dish dictates the terms and the terms are not negotiable .

35.   Defendants distribute the Agreements on preprinted, standardized forms that are not subject to modification or negotiation, or, if the consumer is shopping on the Internet, through read-only screens that cannot be modified by users; Defendants present these Agreements to prospective subscribers on a "take it or leave it" basis. These Agreements are contracts of adhesion.

36.   Each of Defendants' Agreements includes, as a term and condition of service, a purported liquidated damages clause that requires subscribers to pay early termination penalties if for any reason they seek to terminate service before the expiration of the contract period, which is typically one or two years.

37.   These early termination penalties are also due if Defendants terminates the agreement for any reason.

38.   The specified penalty for customers terminating service before the expiration of a specified term is typically a flat fee imposed regardless of the point in the contract in which it is terminated.

39.   The customer must pay the early termination penalty even if cancellation is the result of non-existent, poor, or otherwise inadequate service.

40.   The early termination is a penalty, and, in fact, is not a reasonable measure of the anticipated or actual loss, if any, that the termination causes Defendants.

41.   These fees are illegal penalties when damages are readily calculable and the charge bears no reasonable relationship to the anticipated harm in the event of a breach by the other party. The termination fee is not actually designed to compensate Defendants for any damages arising from the termination, but has the effect and purpose of locking in subscribers and discouraging them from switching to competing services (what is known as "churn").

42.   Defendants' early termination penalty discourages competition in the industry because it prevents consumers from freely shopping around for the best service.

43.   The early termination penalty is not a rate charged, nor is it part of Defendants' rate structure, nor is it a rate component charged for any "service." It is part of the "Terms and Conditions" and can only be categorized as an illegal penalty provision.

44.   The termination penalty is an illegal and void penalty provision. It constitutes an unjust, unconscionable, unlawful, unfair and deceptive practice under all applicable statutes and laws.

45.   Plaintiff is informed and believes that many if not the majority of Defendants' customers are locked into customer service agreements beyond the initial one- or two-year period, at which point Defendants no longer need to purportedly "recover" alleged customer acquisition costs.

46.   Plaintiff is informed and believes that the early termination penalty provisions have permitted Defendants to collect revenues and generate enormous profits as a result of  (a) the payment of the early termination penalties; and (b) the revenue generated by tethering Plaintiff to service for at least the original contract period, and, in most cases, for additional years.

## CLASS ACTION ALLEGATIONS

### A.   Definition of the Class

47.   Plaintiff brings all claims herein as class claims pursuant to Fed. R. Civ. P. 23. The requirements of Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) are met with respect to the classes defined below, of which Plaintiff is a member.

48.   The class consists of all persons who signed contracts with DISH for satellite television services who are subject to, or have had to pay, an ETF and who are not eligible for restitution in the AVC.

49.   The class may be modified pending discovery. Excluded from the Class are members of the judiciary, Defendants, any entity in which they have a

controlling interest, and their officers and directors, and the members of their immediate families are excluded.

**B.   Numerosity**

50.   At this time, Plaintiff does not know the exact size of the Class; however, due to the nature of the trade and commerce involved, Plaintiff believe that Class members are so numerous that joinder of all members is impracticable. The number of class members can be determined through appropriate discovery.

**C.   Commonality**

51.   There are questions of law or fact common to the Class, including at least the following:

(a)   Whether the ETF is unjust, unreasonable and/or unlawful;

(b)   Whether Defendants' conduct violated the Federal Communications Act;

(c)   Whether Defendants charged Class members ETFs;

(d)   Whether the ETF is unjust, and/or unlawful;

(e)   Whether Defendants' conduct constitutes deceptive, unfair and/or oppressive conduct;

(f)   Whether Defendants are/were unjustly enriched;

(g)   Whether Declaratory Relief is appropriate;

(h)   Whether Plaintiff and the Class have been damaged, and if so, the proper measure of such damages; and

(i)   Whether injunctive relief is appropriate.

### D.   Typicality

52.   Plaintiff has the same interests in this matter as all other members of the class, and their claims are typical of all members of the class.

### E.   Adequacy

53.   Plaintiff is committed to pursuing this action and has retained competent counsel experienced in the prosecution and successful resolution of consumer class actions. Plaintiff will fairly and adequately represent the interests of Class members and do not have interests adverse to the Class.

### F.   The Prerequisites of Rule 23(b)(2) are Satisfied

54.   The prerequisites to maintaining a class action for injunctive and equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) exist as Defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole.

55.   The prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. For example, one court might decide that the challenged actions are illegal and enjoin them, while another court might decide that those same actions are not illegal. Individual actions may, as a practical matter, be dispositive of the interest of the Class, who would not be parties to those actions.

56.   Defendants' actions are generally applicable to the Class as a whole, and Plaintiff seeks, *inter cilia,* equitable remedies with respect to the Class as a whole.

57.   Defendants' systemic policy and practices make declaratory relief with respect to the Class as a whole appropriate.

### G.    The Prerequisites of Rule 23(b)(3) Are Satisfied

58.    This case satisfies the prerequisites of Fed. R. Civ. P. 23(b)(3). The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, especially in view of the relatively modest amount of monetary, injunctive and equitable relief at issue for each individual Class member. This action will be prosecuted in a fashion to ensure the Court's able management of this case as a class action on behalf of the Class defined above.

### <u>COUNT I</u>
### (Violation of § 201 of the Federal Communications Act)

59.    Plaintiff repeats the allegations contained in Paragraphs 1-59 as if fully set forth herein.

60.    At all times relevant hereto there was in full force and effect the Federal Communications Act of 1934 ("FCA"), 47 U.S.C. § 201 *et seq.*

61.    This Count is asserted by Plaintiff individually and on behalf of the Class.

62.    Dish is a common carrier engaged in interstate or foreign communication by wire or radio, and subject to the common carrier regulation set forth at 47 U.S.C. § 201, *et seq.*

63.    Dish's termination penalties, described above, are charges and/or practices in connection with communication service, subject to the requirements of 47 U.S.C. § 201(b).

64.    Section 201(b) of the FCA provides that all charges, practices, classifications, and regulations for and in connection with communication service, shall be just and reasonable. 47 U.S.C. § 201(b).

65.    Dish's ETF is unjust, unreasonable and/or unlawful under Section 201(b).

66.    As a direct and proximate result of Dish's violation of 47 U.S.C. §§ 201(b) described above, Plaintiff and the Class have been damaged.

## COUNT II
### (Violation of Colorado Consumer Protection Act 6-1-1-1 *et seq.* Against Dish)

67.    Plaintiff repeats the allegations contained in Paragraphs 1-67 as if fully set forth herein.

68.    This Count is asserted by Plaintiff individually and on behalf of the Class, as defined herein.

69.    Plaintiff brings his statutory fraud claims pursuant to the Colorado Consumer Protection Act ("CCPA").

70.    At all relevant times, Plaintiff, Class members and Dish were "persons" within the meaning of the Consumer Acts, *see e.g.,* 6(sic)-1-102-6(six).

71.    The CCPA is available, by its provisions (6-1-113(1))), "for any claim against any person who has engaged in, or caused another to engage in any deceptive trade practice listed in this article.

72.   Colorado Consumer Protection provides in pertinent part:

(1)   A person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person:

Advertises goods, services, or property with intent not to sell them as advertised;

\*      \*      \*

Makes false or misleading statements of fact concerning the price of goods, services or property or the reasons for, existence of, or amounts of price reductions;

\*      \*      \*

Employs "bait and switch" advertising, which is advertising accompanied by an effort to sell goods, services, or property other than those advertised or on terms other than those advertised and which is also accompanied by one or more of the following practices:

(I)   Requiring tie-in sales or other undisclosed conditions to be met prior to selling the advertised goods, property, or services;

\*      \*      \*

Fails to disclose material information concerning goods, services, or property which information was know at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.

\*      \*      \*

(2)   The deceptive trade practices listed in this section are in addition to and do not limit the types of

> unfair trade practices actionable at common law or
> under other statutes of this state.

73.    Dish imposition of it ETF is an act or practice in the conduct of trade or commerce.

74.    Dish's imposition of the ETF impacts the public interest.

75.    Dish's imposition of the ETF is deceptive because Dish imposes it in violation of the CCCP and employs deceptive practices outlined above to extend contracts.

76.    The imposition of an ETF is unfair because it is imposed even when Dish fails to properly provide class members with the services for which they contracted (as reflected in Dish's own records); while class members are always at risk of breach, Dish is never at risk of breach.

77.    The imposition of an ETF is further unfair because it is imposed even when Dish does not suffer any damages (as reflected in their own records) from a class member's early cancellation.

78.    The ETF is an illegal penalty and is unfair because it offends public policy; is so oppressive that the consumer has little alternative but to submit *(e.g.,* defendants turn "delinquent" accounts over to collections and negatively impact consumers credit history); and causes consumers substantial injury.

79.    Plaintiff and the ETF Class suffered economic injury as a direct and proximate result of Dish's conduct, including but not limited to the amount of the ETFs improperly charged.

80.    Defendants committed deceptive acts or practices within the meaning of the Consumer Acts by engaging in the acts and practices alleged herein.

81.    Defendants' (1) failure to disclose the triggering of new or additional terms of commitment; (2) imposition of new commitments terms triggered by events such as equipment repair or replacement, constitutes unfair and deceptive acts and practices in trade or commerce and unfair methods of competition in violation of the Colorado Consumer Protection Act; (3) offer discounts that are not honored; and (4) draw payments from customer accounts without notice.

## COUNT III
### (Declaratory Relief Pursuant To 28 U.S.C. § 2201 against Dish)

82.    Plaintiff repeat the allegations contained in Paragraphs 1-82 as if fully set forth herein.

83.    This Count is asserted by Plaintiff individually and on behalf of Dish Class, as defined herein.

84.    There is an actual controversy between Dish and the Classes concerning the enforceability of the early termination fee provisions contained in the customer service agreements to which they are all parties.

85.    Pursuant to 28 U.S.C. § 2201 this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

86.    Plaintiff are interested parties who seek a declaration of their rights and legal relations vis-à-vis Dish with regard to early termination fee provisions contained in the customer service agreements to which they are all parties.

87.    Dish's ETF is an unenforceable penalty in that it purports to be a liquidated damages clause when, in fact, the ETF is not a reasonable estimate of the

harm Dish might incur in the event that the customer were to breach his or her customer service agreement.

88.    Moreover, the ETF is chargeable to the customer even if the customer service agreement is terminated by Dish as a result of a breach by Dish. Thus, regardless of the reason for the termination of the customer service agreement or the fault of the parties, the customer is subject to being charged an ETF.

89.    Plaintiff and other class members who were charged and who paid an ETF to Dish have been damaged because they paid a charge which was not legally due and owing.

90.    Plaintiff and other class members who where charged and who did not pay an ETF to Dish have also had their credit damaged because Dish has reported that a debt is owing from such persons when, in fact, no debt is due and owing.

### COUNT IV
### (Unjust Enrichment against Dish)

91.    Plaintiff repeat the allegations contained in Paragraphs 1-91 as if fully set forth herein.

92.    This Count is asserted by Plaintiff individually and on behalf of the Class B, as defined herein.

93.    Defendants received and retained a benefit conferred by Plaintiff and Class Members at their expense through the imposition and collection of ETFs.

94.    As hereinabove alleged, Dish has benefited unjustly at Plaintiff and Class Members' expense, which in equity and good conscience, Dish should not be permitted to retain.

95.    Plaintiff and Class Members have no adequate remedy at law because of Dish's conduct.

96.    As a direct and proximate result of Dish's unjust enrichment, Plaintiff and the Class members have suffered non-monetary and monetary injury.

97.    Plaintiff, on behalf of themselves and the Classes, are entitled to restitution from Dish and an order to ameliorate all ETF credit-related dunning and for the disgorgement of all ETF profits, benefits, and other compensation obtained Dish for its wrongful conduct.

## COUNT V
### (Injunctive Relief Against Dish)

98.    Plaintiff repeat the allegations contained in Paragraphs 1-98 as if fully set forth herein.

99.    This Count is asserted by Plaintiff individually and on behalf of the Defendants' Class as defined herein.

100.    The conduct set forth herein regarding the charging and collection of an ETF is an unjust, unreasonable, and illegal commercial practice in violation of, *inter alia, §* 201 of the Federal Communications Act, and the Consumer Protection laws of the States set forth herein.

101.    Plaintiff and Class Members have no adequate remedy at law because of the Defendants' conduct.

102.    As a direct and proximate result of the Defendants' conduct, Plaintiff and the Class members have suffered non-monetary and monetary injury.

103.    As a direct and proximate result of the Defendants' conduct, Plaintiff and the Class members are entitled to equitable relief enjoining the illegal conduct described herein.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

A.      Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a) and (b)(2) (and/or (b)(3)), and certifying the Class and or Classes defined herein;

B.      Designating Plaintiff as Class representative and counsel as Class Counsel;

C.      Entering judgment in favor of Plaintiff and the Classes and against Dish;

D.      Awarding Plaintiff and Class members their individual damages and attorneys' fees and allowing costs, including interest thereon; and

E.      Granting such further relief as the Court deems just.

Dated:      May 12, 2010.

Respectfully submitted,

Jack Nelson Jones Jiles & Gregory, P.A.
One Cantrell Center
2800 Cantrell Road, Suite 500
Little Rock, AR 72202
Telephone: (501) 375-1122
Facsimile: (501) 375-1927

By:_____
    Randy Coleman, Ark. Bar No. 70018

## ASSURANCE OF VOLUNTARY COMPLIANCE

In the matter of:

DISH NETWORK, L.L.C.,                    )
a Colorado Limited Liability Company     )

1.1   This Assurance of Voluntary Compliance ("Assurance")[1] is being entered into between the Attorneys General of Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia[2], Hawaii[3], Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming (hereafter referred to as the "Attorneys General") and DISH Network, L.L.C.

## 1. BACKGROUND

1.2   DISH Network, L.L.C. ("DISH Network") is a limited liability company organized under the laws of the state of Colorado. Its principal place of business is located at 9601 S. Meridian Blvd, Englewood, CO 80112.

1.3   DISH Network is in the business of, among other things, providing certain audio and video programming services to its subscribers via direct broadcast satellites. In connection with the provision of these services, DISH Network sells and leases receiving equipment to allow access to such programming transmitted from such satellites. DISH Network sells and leases to its subscribers such receiving equipment both directly and through authorized retailers.

---

[1] This Assurance of Voluntary Compliance shall, for all necessary purposes, also be considered an Assurance of Discontinuance.

[2] With regard to Georgia, the Administrator of the Fair Business Practices Act, appointed pursuant to O.C.G.A. 10-1-395, is statutorily authorized to undertake consumer protection functions, including acceptance of Assurances of Voluntary Compliance for the State of Georgia. Hereafter, when the entire group is referred to as the 'Respective States' or 'Attorneys General,' such designation, as it pertains to Georgia, refers to the Administrator of the Fair Business Practices Act.

[3] With regard to Hawaii, Hawaii is represented by its Office of Consumer Protection, an agency which is not part of the state Attorney General's Office, but which is statutorily authorized, pursuant to Hawaii Rev. Stat. Chap. 487, to represent the State of Hawaii in consumer protection actions.



EXHIBIT

A

1.4    DISH Network maintains a fleet of geosynchronous communications satellites and directly sells access to this satellite system to individuals who request access to audio and video programming licensed to DISH Network from video and audio content providers.

**Attorneys General's Position**

1.5    The Attorneys General assert that DISH Network enters into agreements with Third-Party Retailers that DISH Network authorizes, on a non-exclusive basis, to market, promote, and solicit orders from Consumers for the purchase of DISH Network Goods and/or DISH Network Services and/or to provide installation and activation services to Consumers in connection with their purchase of DISH Network Goods and/or DISH Network Services.

1.6    The Attorneys General assert that DISH Network controls the conduct, practices and procedures of its Third-Party Retailers through its DISH Network Retailer Agreement, or similar documents; through "Business Rules" that are established by DISH Network and must be followed by Third Party Retailers; through training that DISH Network provides to its Third-Party Retailers; by requiring Third-Party Retailers to take all actions and refrain from taking any action as reasonably requested by DISH Network in connection with marketing, advertising, promotion and/or solicitation of orders; by requiring Third-Party Retailers to market, promote and describe DISH Network Goods and/or DISH Network Services in a manner approved by DISH Network; by setting all prices for its programming and related promotions and limiting its Third-Party Retailers' ability to offer and sell other goods and services to DISH Network's customers; by requiring Third-Party Retailers to perform installation services consistent with guidelines set forth in DISH Network's Installation Manual; and by requiring Third-Party Retailers to use DISH Network's trademarks, logos and service marks in connection with the retail sale of DISH Network Goods and/or DISH Network Services and otherwise controlling their appearance and conduct when interacting with consumers.

1.7    The Attorneys General assert that they have received complaints from Consumers against DISH Network that its Third-Party Retailers have made misrepresentations and material omissions of fact in connection with their marketing, promotion and sale of DISH Network Goods and/or DISH Network Services and that DISH Network has represented to Consumers that it is not responsible for the conduct of its Third-Party Retailers.  The Attorneys General assert that DISH Network's Third-Party Retailers, with DISH Network's assent, are acting on DISH Network's behalf as its agents and are subject to DISH Network's control.  The Attorneys General further assert that Consumers who do business with DISH Network's Third-Party Retailers reasonably believe that DISH Network's Third-Party Retailers are employees or agents of DISH Network who are acting on behalf of DISH Network and, therefore, DISH Network's Third-Party Retailers are apparent agents of DISH Network.  The Attorneys General assert that, as either actual or apparent agents, DISH Network is responsible for the conduct of its Third-Party Retailers and is bound by the representations made by its Third-Party Retailers to Consumers.

2

1.8     The Attorneys General assert that DISH Network has failed to comply with federal, state and/or local laws regarding Telemarketing, including, but not limited to, those which prohibit calling Consumers who are on federal, state, or local do-not-call lists.

1.9     The Attorneys General assert that DISH Network has committed unfair and deceptive trade practices in violation of the Consumer Protection Acts in connection with their offer, sale and leasing of Dish Network Goods and Dish Network Services by failing to adequately disclose material terms and conditions, including, but not limited to, the terms of their Agreements, the limitations on the availability of programming, limitations on the use of satellite receivers, and limitations on the availability of rebates, credits and free offers.

1.10    The Attorneys General assert that DISH Network has committed unfair and deceptive trade practices in violation of the Consumer Protection Acts by failing to disclose to Consumers that purchased or leased DISH Network Goods were previously used and/or refurbished.

1.11    The Attorneys General assert that DISH Network has committed unfair and deceptive trade practices in violation of the Consumer Protection Acts by advertising prices without adequately disclosing the applicability of rebates and by making reference and comparison price offers when the goods or services that the Dish Network Goods and/or Dish Network Services were being compared to were materially different.

1.12    The Attorneys General assert that DISH Network has committed unfair and deceptive trade practices in violation of the Consumer Protection Acts by electronically debiting Consumers' bank accounts and credit cards without providing Consumers with adequate notice and without first obtaining adequate authorization from Consumers.

**DISH Network's Position**

1.13    DISH Network denies each allegation contained in paragraphs 1.5 through 1.12. Moreover, DISH Network asserts that it has not been deficient in any manner, legally or otherwise, in the way it and its retailers make disclosures to prospective customers, or in the advertising it uses and further asserts it has fully complied with all applicable consumer protection laws and regulations, both federally and across the several states. DISH Network asserts that it places a priority on its efforts to provide quality products and customer service and to that end has policies and procedures to provide a high level of service and fair dealing to customers. DISH Network believes its business practices exude the highest ethical conduct.

1.14    DISH Network asserts that it has cooperated with the Attorneys General during their inquiry. DISH Network values the suggestions of the Attorneys General as to ways in which it can improve its policies and procedures and is willing to agree to the obligations herein in an effort to promote customer relations. However, DISH Network asserts that by entering into this Assurance, it does so denying wrongdoing of any kind and affirmatively states that it

believes the requirements it has agreed to by signing this Assurance are policies, procedures and actions that exceed applicable legal and common law standards, and that it met all legal standards prior to the Attorneys General beginning their investigation. DISH Network asserts that by entering into this Assurance, DISH Network does not intend to create any legal or voluntary standard of care and expressly denies that any practices or policies inconsistent with those set forth in this Assurance violate any legal standard. It is DISH Network's intention and expectation that neither this Assurance nor any provision hereof shall be offered or cited as evidence of a legal or voluntary standard of care. Furthermore, DISH Network asserts that nothing in the Assurance is intended to change the existing independent contractor relationships between DISH Network and its authorized retailers who sell DISH Network products and it believes that no agency relationship is created by the agreements set forth herein. DISH Network agrees to this Assurance so that this matter may be resolved amicably without further cost or inconvenience to the states, their citizens, or DISH Network.

## 2. DEFINITIONS

As used in this Assurance the following words or terms shall have the following meanings:

2.1    "Advertise," "Advertisement," or "Advertising" shall mean any written, oral, graphic, or electronic statement, illustration, or depiction that is designed to create interest in the purchasing or leasing of, impart information about the attributes of, publicize the availability of, or affect the sale, lease, or use of, goods or services, whether the statement appears in a brochure, newspaper, magazine, free-standing insert, marketing kit, leaflet, mailer, book insert, letter, catalogue, poster, chart, billboard, public-transit card, point-of-purchase display, package insert, package label, product instructions, electronic mail, website, homepage, film, slide, radio, television, cable television, program-length commercial or infomercial, or any other medium.

2.2    "Agreement" shall refer to all agreements by whatever name between DISH Network and a Consumer for the purpose of the sale, lease, rental, installation and/or activation of any DISH Network Goods and/or DISH Network Services.

2.3    "Authorized Telemarketer" shall mean a business or other entity that is hired by DISH Network to conduct Telemarketing on DISH Network's behalf in connection with the offer, sale and/or lease of DISH Network Goods and/or DISH Network Services.

2.4    "Billing Agent" shall mean a business or other third-party entity with which Consumers directly interact that has been retained by DISH Network to bill Consumers and/or provide DISH Network other services associated with the

4

billing of Consumers for DISH Network Goods and/or DISH Network Services. "Billing Agent" does not mean any third party who has been retained by DISH Network for the purposes of collecting on delinquent accounts.

2.5    "Clear and Conspicuous" or "Clearly and Conspicuously," when referring to a statement or disclosure, shall mean that such statement or disclosure is disclosed in such size, color, contrast, location, duration, and audibility that it is readily noticeable, readable and understandable. A statement may not contradict or be inconsistent with any other information with which it is presented. If a statement modifies, explains, or clarifies other information with which it is presented, it must be presented in proximity to the information it modifies, in a manner readily noticeable, readable, and understandable, and it must not be obscured in any manner. Audio disclosure shall be delivered in a volume and cadence sufficient for a Consumer to hear and comprehend it. Visual disclosure shall be of a size and shade and appear on the screen for a duration sufficient for a Consumer to read and comprehend it. In a print Advertisement or promotional material, including, but without limitation, point of sale display or brochure materials directed to Consumers, the disclosures shall be in a type size and location sufficiently noticeable for a Consumer to read and comprehend it, in a print that contrasts with the background against which it appears.

2.6    "Complaint" shall refer to a specified problem that a Consumer expresses that represents dissatisfaction with DISH Network Goods and/or DISH Network Services and requests a remedy. It does not include an inquiry or general grievance or concern.

2.7    "Consumer" shall have the same meaning as that term is defined in the Consumer Protection Acts identified in paragraph 2.8 of this Assurance. However, in the event that the Consumer Protection Acts identified herein do not define the term "consumer," then it shall have the same meaning as the term "Person" as defined in the Consumer Protection Acts, or other identifying individual or entity term, as defined by the Consumer Protection Acts.[4]

2.8    "Consumer Protection Act" shall refer to the respective state consumer protection statutes.[5]

---

[4] In Virginia the "Consumer" shall have the same meaning as "consumer transaction" as defined in the Virginia statute cited in paragraph 2.8.

[5] ALABAMA - Deceptive Trade Practices Act, AL ST 8-19-1, 13A-9-42, 8-19-8; ALASKA - Alaska Unfair Trade Practices and Consumer Protection Act, AS 45.50, et seq.; ARIZONA - Arizona Consumer Fraud Act, A.R.S. 44-1521, et seq.; ARKANSAS - Deceptive Trade Practices, AR ST 4-88-101, et seq.; COLORADO - § 6-1-101, et seq., CRS; CONNECTICUT – Connecticut Unfair Trade Practices Act section 42-110a, et seq.; DELAWARE - Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, 2511 to 2527; FLORIDA – Deceptive and Unfair Trade Practices Act, Fla. Stat. Ch. 501.201 et seq.; GEORGIA - Georgia Fair Business Practices Act of 1975, O.C.G.A. 10-1-390, et seq.; HAWAII - Hawaii Rev. Stat. Chap. 480-2(a); IDAHO - Consumer Protection Act, Idaho Code §§ 48-601, et

2.9     "Covered Marketer" means a Third-Party Retailer (1) who can: directly enter sales into DISH Network's order/entry application system ("O/E Retailer"); or (2) whose business operations have resulted in, on average, over 51 DISH Network service activations per month during the previous calendar year.

2.10    "DISH Network Goods" shall mean the equipment and other goods that DISH Network offers, leases and/or sells to Consumers, directly and/or through Third-Party Retailers, that enable customers to receive DISH Network Services.

2.11    "DISH Network Services" shall mean the audio and video programming that DISH Network offers, leases, and/or sells to Consumers, directly and/or through Third-Party Retailers, including, but not limited to, the installation, service, activation and/or delivery of DISH Network satellite television programming, equipment, and/or other goods.

2.12    "Electronic Fund Transfer" or "EFT" shall mean an "electronic fund transfer," as that term is defined in the Electronic Fund Transfer Act, 15 U.S.C. §1601, *et seq.*

---

*seq.*; INDIANA - Deceptive Consumer Sales Act, Ind. Code Ann. §§ 24-5-0.5-1 to 24-5-0.5-12; IOWA - Consumer Fraud Act, Iowa Code § 714.16; KANSAS - Kansas Consumer Protection Act, K.S.A. 50-623, *et seq.*; KENTUCKY - Kentucky Consumer Protection Act, Kentucky Revised Statutes (KRS) 367.110, *et seq.*; LOUISIANA – Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401 *et seq.*; MAINE – Maine Unfair Trade Practices Act, 5 M.R.S. sections 205-A *et seq.*; MARYLAND - Maryland Consumer Protection Act, Maryland Commercial Law Code Annotated 13-101, *et seq.*; MASSACHUSETTS - Mass. Gen. Laws c. 93A, §§ 2 and 4; MICHIGAN - Michigan Consumer Protection Act, MCL 445.901, *et seq.*; MINNESOTA – Minn. Stat. §§ 325F.68 - 325F.70 (Prevention of Consumer Fraud Act), Minn. Stat. § 325F.67 (False Advertising Act), Minn. Stat. §§ 325D.43 – 325D.48 (Uniform Deceptive Trade Practices Act); MISSISSIPPI - Miss. Code Ann. Section 75-24-1, *et seq.*; MISSOURI - MO ST §407.010 to 407.130; MONTANA - Mont. Code Ann. § 30-14-101 *et. seq.*; NEBRASKA - Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*, 87-301; NEVADA - Nevada Deceptive Trade Practices Act, Nevada Revised Statutes 598.0903 to 598.0999; NEW HAMPSHIRE – Regulation of Business Practices for Consumer Protection, NH RSA 358-A; NEW JERSEY - Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*; NEW MEXICO - New Mexico Unfair Practices Act, NMSA 57-12-1, *et seq.*; NEW YORK – Executive Law § 63(12) and General Business Law §§ 349 and 350; NORTH DAKOTA - N.D.C.C. §§ 51-15-01, *et seq.*; OKLAHOMA - Oklahoma Consumer Protection Act, 15 O.S. 751, *et seq.*; OREGON – Unlawful Trade Practices Act ORS 646.605 *et seq.*; PENNSYLVANIA - Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. 201-1, *et seq.*; RHODE ISLAND - Rhode Island Gen. Laws Sec. 6-13.1, *et seq.*; SOUTH CAROLINA – South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.*; SOUTH DAKOTA - South Dakota Deceptive Trade Practices and Consumer Protection Act, RCW §§ 19.86, *et seq.*; WEST VIRGINIA - West Virginia Consumer Credit and Protection Act, WV Code § 46A-1-102, *et seq.*; WISCONSIN, Deceptive Trade Practices Act, Wis. Stat. 100.18(1); and WYOMING – Wyoming Consumer Protection Act, Wyo. Stat. Ann. §§ 40-12-101, *et seq.*

6

2.13    "Telemarketing" shall mean "telemarketing" as that term is defined in the Federal Trade Commission's Telephone Sales Rule, 16 C.F.R. §310.2(cc), and in other federal, state, or local laws defining that term. However, nothing herein shall be construed to affect, restrict, limit, waive, or alter the definition of "telemarketing" under the laws and statutes of the states, and nothing herein shall be construed to limit the authority of the Attorneys General to enforce states' laws and statutes, including those regarding telemarketing.

2.14    "Telemarketing Acts" shall mean: ALABAMA - Telemarketing Act, Ala. Code § 8-19A-1, *et seq.*; ALASKA - AS 45.63, *et seq.*; ARIZONA - A.R.S. sec. 44-1271 thru 44-1282.; ARKANSAS - Consumer Telephone Privacy Act, Arkansas Code Annotated § 4-99-401, *et seq.*, Consumer Protection statute A.C.A. §§ 4-88-101, *et seq.*; COLORADO - § 6-1-901, *et seq.*, CRS; CONNECTICUT - Conn. Gen. Stat. sec 42-288a; DELAWARE - 6 Del. C § 25A; FLORIDA - Consumer Protection Fla. Stat. Ch. 501.059; GEORGIA - O.C.G.A. 46-5-27; HAWAII - Hawaii Rev. State. Section 481P-1 *et seq.*; IDAHO - Idaho Code § 48-1001, *et seq.*; INDIANA - Ind. Code 24-47-1 to -5; IOWA - Consumer Fraud Act, Iowa Code § 714.16; KANSAS - KSA 50-670 and K.S.A. 670(a); KENTUCKY - KRS 367.46951 to 367.46999; LOUISIANA -LSA-R.S. 45:844.11 *et seq.*, the Telephone Solicitation Relief Act of 2001; MAINE - Telephone Solicitations, 10 M.R.S. section 1499-B; MARYLAND - Telephone Consumer Protection Act, Md. Code Ann., Com. Law §§ 14-3201 through 14-3202; MASSACHUSETTS - Mass. Gen. Laws chapter 159C, and 201 Code of Mass. Regulations 12 *et seq.*; MICHIGAN - MCL 445.111, *et seq.* and 445.903(1)(gg); MINNESOTA - Minn. Stat. §§ 325E.311-325E.316 - Minnesota Do Not Call Act; MISSISSIPPI - Miss. Code Ann. Section 77-3-701, et seq. - Mississippi Telephone Solicitation Act; Miss. Code Ann. Section 77-3-601, et seq. - Unsolicited Residential Telephonic Sales Calls Law; MISSOURI - Telemarketing No-Call List, Mo. Rev. Stat. 407.1095 through 407.1110; MONTANA - Mont. Code Ann. §§ 30-14-1601 to -1606; NEBRASKA - Neb. Rev. Stat. §§ 59-1601, *et seq.*, 87-301; NEVADA - Nevada Revised Statutes 228.500., *et seq.*; NEW HAMPSHIRE - NH RSA 359-E; NEW JERSEY - Telemarketing Do Not Call Law, N.J.S.A. 56:8-119, *et seq.*; NEW MEXICO - NMSA 1978, S 57-12-22; NEW YORK – General Business Law §§ 396-m, 399-p, 399-pp and 399-z; NORTH DAKOTA - N.D.C.C. § 51-28-01, *et seq.*; OKLAHOMA - Commercial Telephone Solicitation Act, 15 O.S. 775A.1, *et seq.*; OREGON -- Unlawful Telephone Solicitations Act ORS 646.561 to ORS 646.576; PENNSYLVANIA - Pennsylvania Telemarketer Registration Act, 73 P.S. § 2241, *et seq.*; RHODE ISLAND - Rhode Island Gen. Laws Sec. 6-13.1, *et seq.*; SOUTH CAROLINA – S.C. Code Ann. § 16-17-445 and 446; SOUTH DAKOTA - SDCL ch. 49-31; TENNESSEE – Tenn. Code Ann. § 65-4-405; TEXAS - Texas Telemarketing Disclosure and Privacy Act, Tex. Bus. and Com. Code §§ 304, *et seq.*; UTAH – Telephone and Facsimile Solicitation Act, Utah Code Ann. ** 13-25a-101 through 111 and the Telephone Fraud Prevention Act, Utah Code Ann. ** 13-26-1 through 11; VERMONT - 9 V.S.A. §2464a(b); VIRGINIA – Virginia Telephone Privacy Protection Act, Va. Code §§ 59.1-510 through 59.1-518; WASHINGTON - Commercial Telephone Solicitation Act, RCW 19.158.110(2)(a) and (b); WEST VIRGINIA – West Virginia Code § 46A-6F-101, *et seq.*; WISCONSIN Stat.§ 100.52(4) and Wis. Admin. Code § ATCP 127; WYOMING – Wyoming Consumer Protection Act, Wyo. Stat. Ann. §§ 40-12-101, *et seq.*

2.15    "Third-Party Retailer" shall mean one or more independent persons, a corporation, a partnership, or any other type of entity, as the case may be, that is authorized by DISH Network to offer, lease, sell, service, Advertise, and/or install DISH Network Services and/or DISH Network Goods.

## 3. APPLICATION OF ASSURANCE TO DISH NETWORK AND ITS SUCCESSORS

3.1    DISH Network's duties, responsibilities, burdens and obligations undertaken in connection with this Assurance shall apply to DISH Network and all of its subsidiaries, parents, affiliates, predecessors, successors and assigns of all of the foregoing, and the officers, directors, employees, shareholders, agents, servants, and assigns.  DISH Network shall provide a copy of this Assurance to its subsidiaries, parents, affiliates, predecessors, successors and assigns of all of the foregoing to whom this Assurance applies, and the officers, directors, employees, shareholders, agents, servants, and assigns who have managerial-level responsibilities for performing the obligations outlined in this Assurance.

3.2    For the purposes of paragraphs 4.9, 4.15, 4.16, 4.28, 4.29, 4.30, 4.33, 4.38, 4.39, 4.40, 4.41, 4.42, 4.43, 4.47, 4.48, 4.49, 4.50, 4.51, 4.55, 4.56, and all of Section 5, the term Consumer shall not include any person or entity that purchases or leases any DISH Network Good and/or DISH Network Service solely for a commercial purpose.  Nothing herein shall be construed to limit the authority of the Attorneys General to enforce state laws and statutes, including those regarding commercial and/or non-commercial contracts.

3.3    DISH Network shall require its Third-Party Retailers to comply with the terms and conditions of this Assurance.

## 4. TERMS OF ASSURANCE

Upon execution of this Assurance, DISH Network shall be bound from directly or indirectly engaging in the practices set forth herein and shall be required to directly or indirectly satisfy the affirmative requirements set forth herein.

**General Consumer Protection Provisions**

4.1    DISH Network shall not commit any unfair or deceptive trade practices as defined by any Consumer Protection Act.

4.2    DISH Network shall not misrepresent, expressly or by implication any term or condition of an offer to sell and/or lease any DISH Network Goods and/or DISH Network Services.

8

4.3     DISH Network shall not make any material omissions of fact regarding any term or condition of an offer to sell and/or lease any DISH Network Goods and/or DISH Network Services.

4.4     DISH Network shall not represent or imply that goods or services have characteristics, uses or benefits that they do not have.

4.5     DISH Network shall not offer, Advertise, lease, or sell any goods or services unless, at the time of the offer, Advertisement, lease, or sale, it is able to provide Consumers with a good or the service that complies with any representations that are made in connection with the offer, Advertisement, lease, or sale.

4.6     DISH Network shall not use any statements or illustrations in any Advertisement or representations made to Consumers that create a false impression of the grade, quality, quantity, make, value, age, size, color, usability, or origin of any goods or services or which may otherwise misrepresent the nature, quality and/or characteristics of any DISH Network Goods and/or DISH Network Services.

**Material Terms/No Fine Print**

4.7     In any Advertisement promoting the availability of DISH Network Services and/or DISH Network Goods, DISH Network shall Clearly and Conspicuously disclose any limitations on the availability of DISH Network Services.

4.8     In any Advertisement promoting a benefit that requires any commitment or minimum term of service, DISH Network shall Clearly and Conspicuously disclose any commitment to a minimum term of service required to accept the offer and whether the offer is subject to payment of cancellation fees, termination fees, and any other fines, fees or penalties if Consumers terminate an Agreement prior to the expiration of the commitment period.

4.9     DISH Network shall Clearly and Conspicuously disclose to Consumers at the point of sale or lease prior to scheduling activation or installation of DISH Network Goods and/or DISH Network Services all material terms and conditions of the offer, including, but not limited to: **(i)** any known limitations on the availability of DISH Network Services; **(ii)** costs, fees, penalties or other payment terms Consumers must pay, excluding taxes or other fees required by a governmental entity if they are not known, to receive DISH Network Goods and/or DISH Network Services and to return and/or cancel any DISH Network Goods and/or DISH Network Services; **(iii)** any commitment to a minimum term of service required to accept any offer for DISH Network Goods and/or DISH Network Services; and **(iv)** all cancellation fees, termination fees, and any other fines, fees or penalties that Consumers may be asked to pay if they terminate an Agreement or cancel their service.

9

4.10    DISH Network shall not fail to Clearly and Conspicuously disclose any material term or condition of an offer to sell or lease any DISH Network Goods and/or DISH Network Services, including, but not limited to, failing to Clearly and Conspicuously disclose terms or conditions of an offer by using fine or small print or an inaudible broadcast.

**Equipment Offers**

4.11    DISH Network shall Clearly and Conspicuously disclose in all of its Advertisements and other representations it makes to Consumers offering DISH Network Goods involving the use of more than one satellite television receiver, all material terms and limitations regarding the use of multiple satellite television receivers in connection with the broadcast of DISH Network Services, including, but not limited to, any additional charges that must be paid in connection with the use of more than one satellite television receiver.

4.12    DISH Network shall not sell to Consumers any previously used and/or refurbished DISH Network Goods, including, but not limited to, any satellite television receivers, unless, prior to the sale, it Clearly and Conspicuously discloses to Consumers that the DISH Network Good has been previously used and/or refurbished.

4.13    DISH Network shall promptly replace any leased DISH Network Goods that cease to operate when such cessation is not caused or attributable to improper installation by Consumers or misuse or abuse of the equipment at no cost to Consumers other than the actual cost to ship the replacement good to Consumers.

**Programming Availability**

4.14    When Advertising or offering local channels, if local channels are not or may not be available in all areas where the Advertisement is reasonably expected to appear, DISH Network shall Clearly and Conspicuously disclose in the Advertisement that all local channels may not be available.

4.15    When Advertising or offering DISH Network premium sports packages, DISH Network shall Clearly and Conspicuously disclose in the Advertisement that blackouts may apply or that all games may not be available.

4.16    DISH Network shall Clearly and Conspicuously disclose to Consumers at the point of sale or lease prior to activation or installation of DISH Network Goods and/or DISH Network Services all material terms and limitations concerning the availability of local channels, including, but not limited to, disclosing whether local channels are available in the Consumer's area and specifically identifying which channels are not available.

4.17    DISH Network shall Clearly and Conspicuously disclose to Consumers who order sports packages and channels, at the point of sale or lease prior to activation or installation of

10

DISH Network Goods and/or DISH Network Services, all material terms and limitations concerning the availability of sports packages and channels, including, but not limited to, specifically disclosing whether the sports channels are available in the Consumer's area and that blackouts may apply or that all games may not be available.

4.18   DISH Network shall not represent that DISH Network Services are or may be available in a certain area when they are not.

**Rebates, Credits and Free Offers**

4.19   DISH Network shall Clearly and Conspicuously disclose in all of its Advertisements and other representations it makes to Consumers that include the offer of a rebate, credit, or other discount, all material terms, limitations, and conditions associated with the offer and obtaining the benefit of the offer.

4.20   DISH Network shall not disclose the price for any DISH Network Goods and/or DISH Network Services less any rebate, credit, discount or other amount to Consumers unless DISH Network Clearly and Conspicuously discloses in any Advertisements or representations any material qualifications or limitations for obtaining the rebate, credit, discount or other amount.

4.21   DISH Network shall Clearly and Conspicuously disclose in all of its Advertisements and other representations it makes to Consumers concerning the offer of a free good or service all terms and conditions of the offer.

4.22   DISH Network shall comply with the Federal Trade Commission (FTC) Guide Concerning Use of the Word "Free" and Similar Representations, 16 C.F.R. § 251.

4.23   DISH Network shall comply with all federal, state and local laws, rules and regulations regarding any free offers or other prize, gift, award and incentive promotions.

**Retroactive Changes to Guarantee/Warranty/Refund Program**

4.24   DISH Network shall not retroactively change the terms of any warranty, guarantee, refund, or similar program offered in connection with the sale or lease of any DISH Network Goods and/or DISH Network Services unless the change is being made for the benefit of Consumers, such as expanding the coverage of any warranty, broadening the scope of any refund or other program or coverage, and/or extending any deadlines or expiration dates.

**Reference and Comparison Prices**

4.25   In all of its Advertisements and other representations it makes to Consumers, DISH Network shall comply with the terms of the FTC's guidelines on the use of reference

prices and with all federal, state and local laws, rules and regulations regarding reference-pricing, including, but not limited to: **(i)** disclosing the reference price; and **(ii)** only offering as a reference price a price that has been actively and openly offered for a reasonable period of time.

4.26   DISH Network shall not compare the price of any of DISH Network Goods and/or DISH Network Services with a competitor's price unless the comparison is for a specifically identified item that does not materially differ in composition, grade, quality, style, design, model, name or brand, kind or variety from DISH Network's comparable product.

4.27   DISH Network shall not compare the price of any of DISH Network Goods and/or DISH Network Services to a competitor's price that includes charges to consumers for which DISH Network charges separately, unless DISH Network includes in its advertised price all charges that the competitor includes in its price.

**Formation of Contract: Required Procedures, Notices and Disclosures**

4.28   DISH Network shall Clearly and Conspicuously disclose the following information to all Consumers to whom it sells or leases any DISH Network Goods and/or DISH Network Services, in a written Agreement:

(A)   the length of the term of any Agreement;

(B)   a toll-free number that the Consumer may call to request an itemization of any cost that the Consumer will incur in order to purchase and/or lease or receive DISH Network Goods and/or DISH Network Services that are being offered in the Agreement;

(C)   any minimum programming requirements;

(D)   the amount and mode of calculation of any cancellation or termination fee;

(E)   equipment return policies, procedures, and fees;

(F)   the billing cycle, the amount of any late fees and the date on which any late fees will be imposed;

(G)   all additional fees for miscellaneous services, e.g., third-party billing agent fees, customer service fees, etc.; and

(H)   all payment options that are regularly offered to the Consumer.

4.29   DISH Network shall Clearly and Conspicuously disclose on the Consumer's first bill for any DISH Network Goods and/or DISH Network Services a statement informing the Consumer that if the price, or any portion thereof, is not the price which the Consumer agreed to pay, then DISH Network will either honor the price to which the Consumer agreed or allow the Consumer to cancel his or her Agreement without being charged any penalties or fees. In the event the Consumer receives DISH Network's first bill and the price, or any portion thereof, is not the price which the Consumer agreed to pay, for a period of thirty-five (35) days after the first bill is sent to the Consumer, DISH Network shall either honor the price which the Consumer

agreed to pay or allow the Consumer to cancel his or her Agreement without charging the Consumer any early-termination penalties or fees.

4.30    DISH Network shall, prior to activating DISH Network Services, orally disclose to Consumers the information contained in Paragraph 4.28's subparagraphs A, C, D, E, and G, unless the Consumer purchases DISH Network Goods and/or DISH Network Services via the Internet. If the Consumer purchases and/or leases DISH Network Goods and/or DISH Network Services via the Internet, the disclosures contained in paragraph 4.28's subparagraphs A, C, D, E, and G shall be incorporated into the Consumer's transaction by a method that requires the Consumer to acknowledge such disclosures by checking a box for the disclosures indicating that the Consumer has read and understands each disclosure contained therein, prior to completion of the Consumer's transaction.

4.31    In sales transactions conducted on the Internet, DISH Network shall not add by default or include without affirmative authorization by the Consumer any DISH Network Goods and/or DISH Network Services to the Consumer's transaction(s). Additionally, DISH Network shall not have any selection box indicating a Consumer's request for any DISH Network Service or related service(s) pre-checked during the online sales process.

4.32    If DISH Network offers its Digital Home Protection Plan (DHPP) or any similar plan at no cost to the Consumer for a period of time ("promotional period"), DISH Network shall Clearly and Conspicuously disclose to Consumers as part of its offer the terms and conditions of the offer, including, but not limited to: a) whether the consumer will be automatically billed for DHPP following the expiration of the promotional period; b) that the consumer must cancel DHPP within the promotional period to avoid being automatically billed for it; c) the cost of DHPP and the date that the consumer will be billed for it; d) the means by which the consumer may cancel DHPP during the promotional period; and e) that the offer is optional; and shall obtain the Consumer's express agreement to the offer.

4.33    DISH Network shall, prior to the installation of any DISH Network Goods and/or activation of any DISH Network Services, provide the Consumer with a copy of all Agreement(s) governing the sale, lease, and/or use of any DISH Network Goods and/or any DISH Network Services, including the Agreement containing the disclosures required by Paragraph 4.28. Prior to leaving the Consumer's residence once installation is complete, DISH Network shall provide the Consumer with a fully executed copy of such Agreement(s). For purposes of this paragraph, a fully executed Agreement shall constitute an Agreement that has been signed by the Consumer signifying his or her acceptance of the terms and conditions contained in the Agreement.

4.34    DISH Network shall Clearly and Conspicuously identify by name, mailing address, and toll-free telephone number the entity that the Consumer should contact with questions regarding: (A) billing; (B) installation; (C) equipment; and (D) service. DISH Network may provide this information in the Agreement.

13

4.35   In the event DISH Network assigns any Consumer's account to a third party during the term of the Agreement, DISH Network shall Clearly and Conspicuously inform the Consumer in writing of the assignment and provide the Consumer with the name, address, and the telephone number of the third party.  DISH Network shall communicate such information to the Consumer at least thirty (30) days prior to such assignment.

4.36   DISH Network shall require its Third-Party Retailers to maintain and store a copy of any fully executed Agreement.  DISH Network shall maintain and store a copy of all fully executed Agreements it receives from Consumers for the entire period during which the Consumer is a DISH Network customer and for a minimum period of at least one (1) year thereafter.  DISH Network shall use all commercially reasonable efforts to make a copy of any fully executed Agreement available to the Consumer within fifteen (15) days of the Consumer's request for such Agreement.  In the event that a Consumer requests a copy of his or her Agreement and DISH Network is unable to locate a copy of it, DISH Network shall notify the Consumer of that fact within thirty (30) days of the date of the Consumer's request.

4.37   DISH Network shall not enforce any Agreement unless it is able to provide the Consumer with a copy of his or her fully executed Agreement within (30) thirty days of receiving the Consumer's request for a copy.  The provisions of this paragraph shall have no effect on a Consumer's obligation to return any DISH Network Goods at the expiration or termination of any Agreement or DISH Network's right to charge the consumer a fee subject to the provisions of this Assurance if the Consumer does not return any DISH Network Goods in a reasonable time or collect on programming charges incurred by the Consumer that remain unpaid.

**Contract Terms**

4.38   DISH Network shall not include in its Agreements a waiver of Consumers' rights and/or remedies unless DISH Network Clearly and Conspicuously discloses the rights or remedies that the Consumers are being asked to waive.  Further, DISH Network shall not include in its Agreement in connection with the sale, lease, installation or use of DISH Network Goods and/or DISH Network Services, any language requiring Consumers to waive any rights and/or remedies in contravention of any local, state or federal law.

4.39   DISH Network shall put the following terms in a box or similar design at the top half of the first page of any Agreement that DISH Network requires the Consumer to sign for the purchase or lease of any DISH Network Goods and/or DISH Network Services:

(A)   the length of the Agreement;
(B)   the terms of any early cancellation fee, including the amount and the method of calculation, *i.e.*, whether the penalty is prorated; and

14

(C)    the terms of any fee for a customer's failure to return equipment, including the maximum amount that may be charged for each piece of the equipment the Consumer is leasing that is not returned.

4.40    DISH Network shall use a minimum of 11-point font size in all written Agreements DISH Network enters with Consumers, directly and through Third-Party Retailers.

4.41    DISH Network shall use plain and understandable English in all Agreements DISH Network enters with Consumers, except as provided in Paragraph 4.42

4.42    DISH Network shall, when offering and/or selling DISH Network Goods and/or DISH Network Services, furnish upon request a Spanish-language version of any Agreements and other documents it provides to Consumers who seek to purchase and/or lease DISH Network Goods and/or DISH Network Services.

**Electronic Fund Transfers and Credit Card Autopay**

4.43    In all transactions, DISH Network shall:

(A)    when enrolling a Consumer in an EFT program for recurring automatic payment, obtain written or electronic authorization from the Consumer, which authorization shall include the process by which Consumers may revoke their authorization or cancel their enrollment in the EFT program, and shall otherwise comply with the requirements of the Electronic Fund Transfer Act, 15 U.S.C. §1601, *et seq.*, for obtaining preauthorization to receive recurring electronic fund transfers from a Consumer's bank account;

(B)    when enrolling a Consumer in a Credit Card AutoPay ("CCA") program for recurring automatic payment, obtain written, electronic, or verbal authorization from the Consumer, which authorization shall include explaining to Consumers the process by which Consumers may revoke their authorization or cancel their enrollment in the CCA program;

(C)    maintain the Consumer's written or electronic authorization required under this paragraph for the duration of the Consumer's enrollment in such a program and for a period of not less than two (2) years after the Consumer terminates or revokes the authorization;

(D)    at least ten (10) days prior to effectuating an EFT or credit card charge under an EFT or CCA program, provide a written or electronic bill to the Consumer disclosing: (i) the charges and the exact amount that will be subject to an EFT or credit card charge pursuant to the EFT or CCA program in which the Consumer is enrolled; (ii) the goods or services for which the EFT or credit card charge is

15

being made; (iii) the date on which the recurring EFT or credit card charge will be made; and (iv) a DISH Network telephone number that Consumers may call with any inquiries related to their bills;

(E)     if DISH Network requires a credit card or debit card from a Consumer in order for the Consumer to qualify for a promotion to lease any DISH Network Goods or receive any DISH Network Services ("Qualifying Card"), Clearly and Conspicuously disclose to the Consumer, prior to the Consumer's submission of the card number, that by submitting his or her credit or debit card to qualify for a promotion to lease any DISH Network Goods or receive any DISH Network Services, he or she is authorizing DISH Network to automatically charge or debit his or her card for the cost of any unreturned equipment or for an early-termination or cancellation fee, if applicable;

(F)     when obtaining a Qualifying Card from the Consumer, confirm whether the Qualifying Card is a credit or debit card;

(G)     obtain written authorization from the Consumer to automatically charge or debit the Consumer's Qualifying Card for any penalty fees owed by the Consumer, including, but not limited to, unreturned equipment and early-termination or cancellation fees; such written authorization shall be obtained in a Clear and Conspicuous manner and in no event through a clause in an Agreement unless the clause is Clearly and Conspicuously set apart from, and more prominent than, all other clauses in the Agreement; and

(H)     promptly correct any incorrect charge or debit DISH Network makes to a Consumer's debit or credit card by restoring funds to the Consumer's bank account or refunding the amount to the Consumer's credit card. An "incorrect charge or debit" includes, but is not limited to, any amount charged to a Consumer for unreturned equipment or early cancellation of an Agreement where it is later determined that the Consumer does not, in fact, owe the amount.

4.44     In all transactions, DISH Network shall not:

(A)     use, in any Agreement with Consumers, the term "Credit Card" to refer to or mean a debit card or any other form of an Electronic Fund Transfer as that term is defined by the Electronic Fund Transfer Act, 15 U.S.C. §1601, *et seq.*;

(B)     use a Consumer's credit or debit card or bank account provided by the Consumer to enroll in an EFT or CCA program for any charges other than the Consumer's monthly statement amount, unless the same credit or debit card was provided as the Qualifying Card;

(C)   make a one-time EFT or charge to a debit or credit card without receiving the Consumer's express prior written, electronic, or verbal authorization for the charge;

(D)   make an EFT or charge to a debit or credit card belonging to someone other than the customer named on the specific DISH Network account without obtaining the non-account-holder's prior express written, electronic, or verbal authorization for the payment;

(E)   make a charge to a debit card for any penalty payment, including, but not limited to, a cancellation or termination fee or unreturned equipment fee, without providing the Consumer with at least ten (10) days' written notice, or email notice if the Consumer has affirmatively chosen to receive his or her monthly statement electronically, of the maximum amount that will be charged or debited and the date on which the charge or debit will be made, or, in the case of unreturned equipment fees, the charge DISH Network is going to impose for each piece of unreturned equipment that the Consumer has leased, and the date the charge or debit will be made, and such notice shall include, where applicable, a description of how the Consumer can calculate his or her exact early-cancellation charge and a table showing the exact price of each piece of equipment, along with a toll-free number that the Consumer may call to inquire about the notice; and

(F)   make an automatic credit or debit from any credit or debit card for any penalty payment, including, but not limited to, an early-cancellation fee or unreturned equipment fee, from any credit or debit card other than a credit or debit card that belongs to a DISH Network account holder.

**Termination of Services and Equipment Return**

4.45   DISH Network shall not bill a Consumer a cancellation, termination, and/or other fee in connection with the termination of DISH Network Services and/or the return of DISH Network Goods unless it can document that it has complied with the terms of its Agreement and any representations it has made to Consumers regarding DISH Network's and/or the Consumer's obligations with respect to cancellation or termination of DISH Network Services and/or the return of DISH Network Goods.

4.46   Prior to charging any Consumer who voluntarily cancels DISH Network Services any cancellation, termination, and/or other fee in connection with the termination, and/or return of any DISH Network Goods, DISH Network shall Clearly and Conspicuously disclose to the Consumer the following information: **(i)** the exact amount of any cancellation or termination and/or other fee that the Consumer is being charged; **(ii)** if the amount of any cancellation, termination and/or other fee that the Consumer is being charged is related to the return of any DISH Network Goods, the exact pieces of equipment and the maximum charge per piece of

17

equipment; **(iii)** notification that the Qualifying Card will be debited or charged for the termination, cancellation, and/or fee related to the return of DISH Network Goods; **(iv)** the terms and conditions under which the Consumer must return any DISH Network Goods to DISH Network; **(v)** a toll-free telephone number that the Consumer may call to discuss or dispute the bill; and **(vi)** the procedure the Consumer may follow to avoid incurring the cancellation, termination and/or other fee, if any.

4.47    Prior to charging any Consumer whose DISH Network Services are involuntarily terminated any cancellation, termination, and/or other fee in connection with the termination, and/or return of any DISH Network Goods, DISH Network shall Clearly and Conspicuously disclose to the Consumer the following information:    **(i)** the maximum amount of any cancellation or termination fee; **(ii)** if the amount of any fee that the Consumer is being charged is related to the return of any equipment, the maximum charge per piece of equipment; **(iii)** notification that the Qualifying Card will be debited or charged; **(iv)** a toll-free telephone number that the Consumer may call to discuss or dispute the bill; and **(v)** the procedure the Consumer may follow to avoid incurring the cancellation, termination and/or other fee, if any.

4.48    If a Consumer notifies DISH Network or one of its Third-Party Retailers of a problem regarding a recurring impairment and/or material limitation to the quality or usability of any DISH Network Services, including, but not limited to, recurring material interference of signal reception, that is not caused or attributable to improper installation by the Consumer, a change in alignment of the satellite receiving equipment that is not caused by DISH Network, misuse or abuse of the equipment, and/or other factors not within DISH Network's control, DISH Network shall either (i) allow the Consumer to cancel his or her Agreement without the imposition of a termination fee, or (ii) directly or through its Third-Party Retailer, schedule and complete an in-home service appointment to correct the problem. If DISH Network cannot correct the impairment or limitation problem within thirty (30) days of DISH Network's receipt of such Consumer's initial impairment or limitation notification, the Consumer shall have the right to cancel his or her Agreement with DISH Network without the imposition of an early-termination fee.

4.49    DISH Network shall not deactivate or otherwise terminate any Consumer's account unless it notifies the Consumer that the Consumer's DISH Network Services are to be deactivated or otherwise terminated, at least twenty (20) days prior to the deactivation or termination, and Clearly and Conspicuously discloses the upcoming deactivation or termination, the reason for the deactivation or termination and what actions or recourse, if any, the Consumer may take to avoid the deactivation or termination.

4.50    DISH Network shall not wrongfully terminate any Consumer's Agreement. For purposes of this Assurance, wrongful termination of a Consumer's Agreement shall include termination as a result of any error by DISH Network or in violation of any Agreement. In the event DISH Network wrongfully terminates any Agreement, DISH Network shall (i) refund any amount it charged the Consumer in connection with the wrongful termination and (ii) not charge

18

the Consumer whose Agreement was wrongfully terminated any reactivation fee or other fee to reactivate DISH Network Services. If, as a result of DISH Network's wrongful termination of any Agreement, DISH Network reports any information regarding a Consumer to any credit-reporting agency or bureau, DISH Network shall provide the bureau or credit-reporting agency with a report correcting the information it previously provided to the credit-reporting agency or bureau.

4.51    DISH Network shall not charge Consumers any fee in connection with the return of any DISH Network Goods if DISH Network fails to comply with the terms of any Agreement or any representations that it makes to Consumers in connection with the return of any DISH Network Goods.

4.52    . DISH Network shall not charge any Consumer any cancellation or termination fee in connection with the termination of any DISH Network Services that exceeds the amount of the Consumer's remaining payment obligation under any Agreement.

4.53    DISH Network shall not charge any Consumer any cancellation, termination or other fee in connection with the return of any DISH Network Goods that exceeds the Manufacturer's Suggested Retail Price (M.S.R.P.).

**Credit Check Policies**

4.54    When conducting a credit check, DISH Network shall disclose to Consumers prior to the sale or lease of any DISH Network Goods and/or DISH Network Services, any requirement that Consumers provide DISH Network with their social security numbers in order to activate any DISH Network Services or to purchase or lease any DISH Network Goods. DISH Network shall further disclose to Consumers, prior to the sale or lease of any DISH Network Goods and/or DISH Network Services, the reason for requiring a social security number. If requested by the Consumer, DISH Network shall identify at the time of such request any third party with whom DISH Network may share the Consumer's social security number. Furthermore, DISH Network shall comply with all federal, state and local laws, regulations, and rules regarding the gathering, maintaining, storing, destruction and sharing of Consumers' social security numbers.

4.55    DISH Network shall issue an adverse action notice pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, to any Consumers against whom DISH Network took any adverse action based in whole or in part on any information contained in the Consumer's credit report, including, but not limited to, refusing to offer a promotional discounted price for any DISH Network Services and/or DISH Network Goods or requiring a deposit in connection with the purchase of any DISH Network Services and/or the purchase or lease of any DISH Network Goods.

19

**Third-Party Retailers**

4.56 DISH Network shall require its Third-Party Retailers to offer, lease, Advertise, install, and/or sell DISH Network Goods and/or DISH Network Services, and to make representations to Consumers in connection therewith, in a manner consistent with the terms of this Assurance.

4.57 DISH Network shall require its Third-Party Retailers to use telemarketers who comply with the provisions of this Assurance. If DISH Network learns that any of its Third-Party Retailers are conducting any Telemarketing activities, directly or through any other telemarketer, that violate the terms of this Assurance, DISH Network shall take appropriate disciplinary action against such Third-Party Retailers. Appropriate disciplinary action may include one or more of the following remedies:

1) termination;
2) imposing monetary fines;
3) withholding of compensation;
4) suspending the right to Telemarket (directly or through a third-party) for a period of time;
5) prohibiting telemarketing (directly or through a third-party);
6) requiring the Third-Party Retailer to impose appropriate guidelines on its Telemarketing activities, such as procedures for compliance with the TCPA and/or any other federal, state or local laws regarding Telemarketing;
7) requiring the Third-Party Retailer to terminate a person or entity that is Telemarketing on its behalf; and/or
8) other appropriate and reasonable discipline under the circumstances

4.58 DISH Network shall affirmatively investigate Complaints made to it or to the Better Business Bureau by Consumers, regulatory agencies or law enforcement entities, when such Complaints are brought to the attention of DISH Network, pertaining to its Third-Party Retailers' offer, Advertisement, installation, lease, and/or sale of DISH Network Goods and/or DISH Network Services, and shall take appropriate and reasonable disciplinary action as soon as reasonably practicable, against any Third-Party Retailer it has determined to be in violation of the requirements of this Assurance. Appropriate action may include retraining and other disciplinary action, up to and including termination of the Third-Party Retailer's authority to offer, Advertise, install, lease, and/or sell DISH Network Goods and/or DISH Network Services. Upon request of an Attorney General, DISH Network shall provide the Attorney General with the following information: (i) the name, address, and phone number of the Consumer who made the allegation or complaint; (ii) a copy or description of the allegation or complaint; (iii) the name, address and phone number of the Third-Party Retailer against whom the allegation or complaint was lodged; and (iv) a description and any documentation of the specific action it took regarding the complaint or allegation. DISH Network shall maintain the information required under this paragraph for a period of not less than six (6) years including, but not limited to, any

record that refers or relates to any Complaints it receives against any Third-Party Retailers and any record that refers or relates to any investigation by DISH Network of such Complaints.

4.59    DISH Network shall be bound by and honor any representations that are made to Consumers by its Third-Party Retailers who offer, Advertise, install, lease, and/or sell DISH Network Goods and/or DISH Network Services made with DISH Network's prior authorization, approval, permission or knowledge.

4.60    Within thirty (30) days of the date of the entry of this Assurance, DISH Network shall provide each Third-Party Retailer who offers, Advertises, installs, leases, and/or sells DISH Network Goods and/or DISH Network Services with a copy of this Assurance and inform such Third-Party Retailers that in order to continue acting as authorized DISH Network Third-Party Retailers, they must abide by the applicable terms and conditions of this Assurance.

4.61    DISH Network shall not allow its Third-Party Retailers to charge any fees to Consumers for DISH Network Services and/or DISH Network Goods other than: **(i)** for installation or activation, if the amount and the purpose of the fees are Clearly and Conspicuously disclosed in writing to Consumers prior to their entering any Agreement with DISH Network; and **(ii)** any after-sale services and/or goods performed or sold by the Third-Party Retailer.

4.62    DISH Network shall require its Third-Party Retailers, when offering, installing, servicing, leasing, and/or selling any DISH Network Goods and/or DISH Network Services, to identify themselves to Consumers, including Clearly and Conspicuously disclosing their name, address and telephone number, and their relationship to DISH Network, and DISH Network shall require its Third-Party Retailers, upon receipt of any Complaint from a Consumer, to provide the Consumer with DISH Network's toll-free telephone number for resolving Complaints.

**Account Assignment to Third Parties**

4.63    In the event that DISH Network assigns a Consumer's account to a Billing Agent, at least forty-five (45) days in advance of such assignment, DISH Network must send the Consumer a notice Clearly and Conspicuously disclosing the following: **(i)** the name, address and phone number of the Billing Agent; **(ii)** an itemization of the amounts that have been assigned to the billing agent; and **(iii)** a description of the services provided for which the amounts are being billed.

4.64    DISH Network shall comply with the Fair Debt Collection Practices Act, 15 U.S.C. § 1601, *et seq.*, and all state and local collections laws.

4.65    DISH Network shall monitor and be responsible for the conduct of any Billing Agent to which it assigns any Consumer's account, including, but not limited to, receiving and

resolving Consumer complaints made against such Billing Agents in connection with the billing for any DISH Network Goods and/or DISH Network Services.

4.66    In the event that DISH Network assigns a Consumer's account to a Billing Agent, the terms of such an assignment shall include the requirement that the Billing Agent abide by any terms contained in any Agreement concerning the collection of any outstanding balance owed by the Consumer.

**Telemarketing and Do Not Call**

4.67    DISH Network shall comply with all federal, state and local laws regarding Telemarketing, including, but not limited to, those which prohibit calling Consumers who are on any federal, state, or local do-not-call lists unless otherwise exempted by such laws.

4.68    DISH Network shall comply with all federal, state and local laws requiring the acquisition or purchase of national and state do-not-call databases and shall not make any Telemarketing calls to Consumers in the applicable state or municipality until it has acquired or purchased a l do-not-call databases required by federal, state, or local laws.

4.69    DISH Network shall not initiate an outbound Telemarketing call directly or through an Authorized Telemarketer to a person who has previously stated to DISH Network or an Authorized Telemarketer that he or she does not wish to receive a Telemarketing call made by or on behalf of DISH Network, or has expressed a desire to be placed on DISH Network's internal do-not-call list.

4.70    DISH Network shall require any and all Authorized Telemarketers during any Telemarketing calls they make to **(i)** provide to the Consumer the first name of the representative that is making the call and **(ii)** inform the Consumer that the Telemarketing call is made on DISH Network's behalf.

4.71    DISH Network shall register with any and all governmental entities or agencies as required by applicable federal, state and local laws in each jurisdiction in which it engages in Telemarketing activities.

4.72    DISH Network shall, if and to the extent that it is not already the existing practice of DISH Network, establish and implement an internal do-not-call list, as well as policies and procedures, to ensure that, subject to exemptions provided in federal, state or local law, DISH Network and any Authorized Telemarketer through which it contacts Consumers for the purpose of offering and/or selling DISH Network Goods and/or DISH Network Services, do not call any Consumers on DISH Network's internal do-not-call list or any Consumer listed on any federal, state or local do-not-call list, unless otherwise exempted by such laws.  DISH Network shall monitor or retain a third-party vendor to monitor outbound telemarketing campaigns conducted by an Authorized Telemarketer to determine whether the Authorized Telemarketer is complying

22

with all applicable federal, state, and local do-not-call laws.  Upon request from an Attorney General, DISH Network shall provide the Attorney General with a copy of such written policies and procedures.

4.73    DISH Network shall issue business rules to its Authorized Telemarketers and Covered Marketers, requiring them to comply with the terms of this Assurance.

4.74    DISH Network shall affirmatively investigate Complaints regarding alleged violations of federal, state and local laws regarding Telemarketing, including, but not limited to, those which prohibit calling Consumers who are on any federal, state, or local do-not-call lists, unless otherwise exempted by such laws, and shall take appropriate action as soon as reasonably practicable against any Authorized Telemarketers and Covered Marketers it has determined to be in violation of the requirements of this Assurance.  Upon request from an Attorney General, DISH Network shall provide the Attorney General with the following information: **(i)** the name, address, and phone number of the Consumer who made the allegation or Complaint; **(ii)** a copy or description of the allegation or Complaint; and **(iii)** the name, address and phone number of the Authorized Telemarketer or Covered Marketer against whom the allegation or Complaint was lodged.  Further, DISH Network shall be required to notify the Attorney General of the specific action it took regarding the Complaint or allegation if so requested.

4.75    Within thirty (30) days of the date of the execution of this Assurance, DISH Network shall provide each Authorized Telemarketer and each Covered Marketer with a copy of this Assurance and inform them that in order to continue acting as DISH Network Authorized Telemarketers or Covered Marketers, they must abide by the terms and conditions of this Assurance.

4.76    DISH Network shall appropriately discipline an Authorized Telemarketer if DISH Network reasonably determines that, in connection with Telemarketing DISH Network Goods and/or DISH Network Services, the Authorized Telemarketer has: **(a)** failed to fulfill contract requirements with respect to compliance with federal, state, or local telemarketing laws; **(b)** violated federal, state, or local telemarketing laws; and/or **(c)** failed to comply with the terms of this Assurance as they relate to this Telemarketing and Do Not Call section.  Such disciplinary action shall include one or more of the following remedies:

1)      termination;
2)      imposing monetary fines;
3)      withholding of compensation;
4)      suspending the right to Telemarket for a period of time;
5)      prohibiting Telemarketing;
6)      requiring the Authorized Telemarketer to improve its process and procedures for compliance with the Telephone Consumer Protection Act (TCPA), 47 U.S.C. §227, *et seq.*, and/or any other federal, state and local laws regarding Telemarketing;

23

7)  requiring the Authorized Telemarketer to terminate certain employees involved in TCPA violations and/or violations of any other federal, state and local laws regarding Telemarketing;

8)  requiring the Authorized Telemarketer to terminate Telemarketing affiliates;

9)  requiring the Authorized Telemarketer to retrain employees in TCPA compliance and/or compliance with any other federal, state and local laws regarding Telemarketing; and/or

10)  other appropriate and reasonable discipline under the circumstances.

In determining what disciplinary action shall be taken, DISH Network shall take into consideration the egregiousness of the Authorized Telemarketer's conduct, the number of violations, the Authorized Telemarketer's willingness to cure the problem, and whether DISH Network has previously disciplined the Authorized Telemarketer.

4.77    DISH Network shall require any Covered Marketer that Telemarkets any DISH Network Goods and/or DISH Network Services to establish written policies and procedures to comply with all federal, state and local laws regarding Telemarketing, including, but not limited to, those which prohibit calling Consumers who are on any federal, state and local do-not-call list.

4.78    DISH Network shall monitor, directly or through a third-party monitoring service approved by DISH Network, its Covered Marketers to determine whether they are Telemarketing Consumers and, if so, to determine whether the Covered Marketer is complying with all applicable federal, state, and local do-not-call laws.  Upon request from an Attorney General, DISH Network shall provide the requesting Attorney General with a copy of such written policies and procedures.  DISH Network states that it has had persons pose as potential subscribers in order to engage in "sting"-type operations to determine if certain Covered Marketers are complying with its do not call policies.  Among other things, DISH Network will continue engaging in such practices as part of the monitoring process described above.

4.79    DISH Network shall appropriately and reasonably discipline a Covered Marketer if DISH Network reasonably determines that, in connection with Telemarketing DISH Network Goods and/or DISH Network Services, the Covered Marketer has: **(a)** failed to fulfill contract requirements with respect to compliance with federal, state, or local telemarketing laws; **(b)** violated federal, state, or local telemarketing laws; and/or **(c)** failed to comply with the terms of this Assurance as they relate to this Telemarketing and Do Not Call section.  Such disciplinary action shall include one or more of the following remedies:

1)  termination;

2)  imposing monetary fines;

3)  withholding of compensation;

4)  suspending the right to Telemarket for a period of time;

5)  prohibiting Telemarketing;

24

6)   requiring the Covered Marketer to improve its process and procedures for compliance with the TCPA and/or any other federal, state and local laws regarding Telemarketing;

7)   requiring the Covered Marketer to terminate certain employees involved in TCPA violations and/or violations of any other federal, state and local laws regarding Telemarketing;

8)   requiring the Covered Marketer to terminate Telemarketing affiliates;

9)   requiring the Covered Marketer to retrain employees in TCPA compliance and/or compliance with any other federal, state and local laws regarding Telemarketing; and/or

10)  other appropriate and reasonable discipline under the circumstances.

In determining what disciplinary action shall be taken, DISH Network shall take into consideration the egregiousness of the Covered Marketer's conduct, the number of violations, the Covered Marketer's willingness to cure the problem, and whether DISH Network has previously disciplined the Covered Marketer.

**Complaint Handling**

4.80   DISH Network shall maintain all Consumer Complaints it receives and DISH Network's responses to those Consumer Complaints for a period of at least three (3) years from the date of DISH Network's receipt of the Consumer Complaint.  DISH Network may maintain these Complaints electronically if it so chooses.

4.81   Within thirty (30) days of the entry of this Assurance, DISH Network shall appoint a person or persons or an entity to act as a direct contact for the Attorneys General Offices (or other state agencies responsible for Complaint mediation) for resolution of Consumer Complaints.  DISH Network shall provide the Attorneys General (or other state agencies) with the name(s), address(es), telephone number(s), facsimile number(s) and e-mail address(es) of the person(s) or entity(ies) within three (3) days of his/her/its appointment.

4.82   DISH Network shall record a Consumer Complaint by including: (i) a description of the Complaint; (ii) the date DISH Network received the Complaint; (iii) a summary of relevant communications with the Consumer regarding the Complaint; and (iv) a description of the ultimate resolution of the Complaint that includes any relief provided.

## 5. RESTITUTION

5.1   DISH Network agrees to pay restitution and/or other appropriate relief to Consumers who have Eligible Complaints.  For purposes of the Restitution section of this Assurance, an Eligible Complaint is a written request or demand from a Consumer residing in the signatory Attorney General's state and that: (i) was received by DISH Network and/or one of

25

the Attorneys General and/or any other state agency located in one of the signatory Attorney General's states handling Consumer complaints between January 1, 2004 and the date of the entry of this Assurance, and the Complaint remains either fully or partially unresolved; or (ii) is received by DISH Network, either directly from a Consumer or through a third party such as an Attorney General's Office, any state Consumer complaint-handling agency or Better Business Bureau, within one hundred and fifty (150) days from the date of the entry of this Assurance and concerns conduct that occurred during the two-year period prior to the date of this Assurance.

5.2    Consistent with the terms of this Assurance, DISH Network shall resolve each Eligible Complaint by offering the Consumer the option of either (i) accepting restitution or some other appropriate relief offered by DISH Network or (ii) if DISH Network is unable to resolve the Complaint to the Consumer's satisfaction, using the Claim Form attached hereto as Exhibit A, DISH Network shall inform the Consumer that he/she may submit his/her Eligible Complaint to a neutral third-party (the "Claims Administrator") who shall manage and administer a complaint-resolution program pursuant to the terms of this Assurance. The selection of the Claims Administrator and any successor administrator shall be subject to the approval of the Attorneys General.

5.3    Within fifteen (15) days of receiving an Eligible Complaint, DISH Network shall attempt to resolve the Eligible Complaint by offering the Consumer who filed the Eligible Complaint restitution and/or some other appropriate relief. If, within (15) days of receiving an Eligible Complaint, DISH Network is unable to resolve the Eligible Complaint to the Consumer's satisfaction, DISH Network shall inform the Consumer of his or her ability to submit his or her complaint to the Claims Administrator for resolution by mailing the Consumer the Claim Form attached hereto as Exhibit A. The Claim Form shall describe the restitution and/or other appropriate relief that DISH Network is offering to resolve the Eligible Complaint and shall explain the procedure for accepting DISH Network's offer and for rejecting the offer and submitting the Eligible Complaint to the Claims Administrator for resolution. Acceptance by a Consumer of any relief offered by DISH Network shall not act as a release by the Consumer of any claims that he or she may have against DISH Network. However, DISH Network shall have the right to raise defenses available to it arising from the acceptance of the offer, including that the relief provided shall mitigate any damages that are asserted. If a Claim Form is returned to DISH Network as undeliverable, DISH Network shall attempt to locate the Consumer by: (i) mailing the Claim Form to any forwarding address provided by the U. S. Postal Service for the Consumer; (ii) mailing the Claim Form to any additional addresses for the Consumer contained in DISH Network's business records; and (iii) contacting the Consumer at any phone number, e-mail address, or facsimile number that is contained in DISH Network's business records regarding the Consumer for the purpose of obtaining a correct mailing address and mailing the Claim Form to the Consumer at the correct mailing address.

5.4    A Consumer may elect to have his/her Eligible Complaint decided by the Claims Administrator by submitting the Claim Form to DISH Network within forty-five (45) days of the date of the mailing of the Claim Form by DISH Network. The Consumer may return the Claim

Form to DISH Network via the U.S. Postal Service or via facsimile or other additional manner set forth by DISH Network. For purposes of this paragraph, the date on which a Claim Form is returned to DISH Network shall be either (i) the date of any postmark contained on the envelope used to return the Claim Form to DISH Network via U.S. mail; or (ii) the date on which the Claim Form is returned to DISH Network via facsimile.

5.5     DISH Network shall, within ten (10) days of its receipt of a Claim Form from a Consumer, provide the Claims Administrator a copy of: (i) the Consumer's Eligible Complaint; (ii) the Consumer's submitted Claim Form; and (iii) any other document mailed by the Consumer with either his/her Claim Form or Eligible Complaint. DISH Network shall also provide the Claims Administrator any documents transmitted by the Consumer to DISH Network prior to the Claims Administrator's resolution of the Consumer's Eligible Complaint relating to the Consumer's Eligible Complaint and any other relevant information.

5.6     DISH Network shall provide any Consumers who accept its offer of restitution and/or other appropriate relief with the restitution payment and/or any other appropriate relief that was accepted by the Consumer no later than thirty (30) days from the date the Consumer accepted DISH Network's offer of restitution and/or other appropriate relief.

5.7     Within thirty (30) days of the date of the entry of this Assurance, DISH Network shall hire the Claims Administrator. For the purpose of protecting the proprietary and customer information to be provided to him/her by DISH Network, the Claims Administrator shall enter into a contractual relationship with DISH Network consistent with the terms of this Assurance.

5.8     DISH Network shall pay the Claims Administrator and all costs associated with the complaint-resolution program provided for in this Assurance.

5.9     The Claims Administrator shall be responsible for, among other things, the collection of all Eligible Complaints and supporting documents necessary for determination of restitution and/or other appropriate relief to Consumers. The Claims Administrator shall request from DISH Network and the Consumer all information he/she deems necessary to make a full and fair resolution of an Eligible Complaint. The Claims Administrator shall conduct a paper review of the Eligible Complaint and any supporting documentation. No state or federal rules of evidence shall apply to the Claims Administrator's review. The complaint-resolution program shall be designed in a Consumer-friendly non-legal environment to encourage the Consumer's participation in the process. *Ex parte* communication with the Claims Administrator will not be allowed pertaining to any specific Eligible Complaint or as to the criteria used in evaluating each Eligible Complaint.

5.10     The Claims Administrator is responsible for the coordination of the complaint-resolution program with the full and complete cooperation of all parties to this Assurance. The Claims Administrator's resolution of Eligible Complaints shall be binding only on the Attorneys General and DISH Network. The Claims Administrator shall conduct hearings on Eligible

27

Complaints by telephone when requested by either party or when deemed necessary by the Claims Administrator for his or her resolution of an Eligible Complaint. The Consumers shall be informed in writing of the option for a telephonic hearing.

5.11    The Claims Administrator shall issue a decision regarding an Eligible Complaint within a reasonable period of time following receipt of the Eligible Complaint and all required and/or requested documents, but in no event shall the decision be issued later than thirty (30) days following receipt of the Eligible Complaint or any supporting documentation without good cause, and shall deliver the decision to DISH Network and to the Consumer whose Eligible Complaint is the subject of the decision. In the event a decision issued by the Claims Administrator requires DISH Network to provide a Consumer with a restitution payment and/or other appropriate relief, DISH Network shall, within thirty (30) days of its receipt of such decision, deliver to the Consumer the required restitution payment and/or other appropriate relief.

5.12    On the first and second year anniversary date of the hiring of the Claims Administrator, DISH Network shall provide a report broken down by state to the Attorneys General, in a format and medium to be agreed upon by DISH Network and the Attorneys General, setting forth the following information:

(A)    the number of Eligible Complaints received from DISH Network;

(B)    a description of the nature of each Eligible Complaint, including a description of the business practices that are the focus of the Eligible Complaint;

(C)    the name and address of each Consumer who filed an Eligible Complaint;

(D)    a description of the resolution of the Eligible Complaint, including the amount of any restitution payment and a description of any other relief offered;

(E)    a statement whether the Eligible Complaint was submitted to the Claims Administrator; and

(F)    if the Eligible Complaint was submitted to the Claims Administrator, the decision of the Claims Administrator and response, if any, of any Consumer to the decision, including documentation of a Consumer's acceptance of any relief ordered by the Claims Administrator.

5.13    At the request of DISH Network, the Attorneys General, or the Claims Administrator, the Claims Administrator or his/her designee, shall meet and confer with the Attorneys General and DISH Network for any purpose relating to the administration of the complaint-resolution program provided for under this Assurance, including, but not limited to, monitoring and auditing the complaint-resolution program. Problems that arise concerning the implementation of the complaint-resolution program may be resolved by agreement among the Attorneys General, DISH Network and the Claims Administrator.

## 6. PAYMENT TO THE ATTORNEYS GENERAL

6.1     Within thirty (30) days of entry of this Assurance, DISH Network shall pay the sum of Five Million Nine Hundred Ninety-One Thousand Dollars ($5,991,000), to the Attorneys General.  Such sum is to be divided among the Attorneys General as they may agree and said payment shall be used by the Attorneys General for attorneys' fees and other costs of investigation and litigation and/or for future public protection purposes, or be placed in, or applied to, the consumer protection enforcement fund, consumer education, litigation or local consumer aid fund or revolving fund, used to defray the costs of the inquiry leading hereto, or for other uses permitted by state law, at the sole discretion of each of the Attorneys General.[6]

## 7. GENERAL PROVISIONS

7.1     The acceptance of this Assurance by the Attorneys General shall not be deemed approval by the Attorneys General of any of DISH Network's Advertising or business practices. Further, neither DISH Network nor anyone acting on its behalf shall state or imply or cause to be stated or implied that the Attorneys General, or any other governmental unit, have approved, sanctioned or authorized any practice, act, Advertisement, representation, or conduct of DISH Network.

7.2     This Assurance does not constitute an admission by DISH Network for any purpose of any fact or of a violation of any law, rule or regulation, nor does this Assurance constitute evidence of any liability, fault or wrongdoing.  This Assurance is entered into without trial or adjudication of any issue of fact or finding of liability of any kind.  Neither this Assurance, nor any negotiations, statements or documents related thereto, shall be offered or received in evidence as an admission of liability or wrongdoing.  This Assurance is not intended to confer upon any person any rights or remedies, shall not create any third-party beneficiary rights and may not be enforced by any person, entity or sovereign except the Attorneys General.

7.3     DISH Network shall comply with the terms of this Assurance within ninety (90) days following the execution of this Assurance, or within the time frames otherwise set by this Assurance.

7.4     The Attorneys General shall not institute any civil proceeding or action under their Consumer Protection Acts and Telemarketing Acts[7] against DISH Network or its successors, employees, officers and/or directors for any conduct occurring prior to the entry date

---

[6] With regard to the State of Colorado, such funds and any interest thereon shall be held by the Attorney General in trust to be used, first, for reimbursement of the state's costs and attorneys' fees incurred by the Attorney General in this matter and second, for future consumer education, consumer protection, or antitrust enforcement efforts.
[7] In Indiana, Minnesota, Mississippi, South Carolina, Tennessee and Texas, state agencies other than the Attorney General also have enforcement authority for Do Not Call violations and are not releasing those claims in this settlement.

of this Assurance that is based on the conduct addressed in Section Four (4) of the Assurance. This Assurance constitutes a complete settlement and release of all claims on behalf of the Attorneys General against DISH Network with respect to all civil claims, causes of action, damages, restitution, fines, costs, attorneys' fees and penalties pursuant to the Consumer Protection Acts and Telemarketing Acts arising from any acts, issues, policies or practices prior to the entry of this Assurance and which related to or were based upon the specific subject matter raised in Section Four (4) of this Assurance. However, nothing in this Assurance, including this Paragraph 7.4, shall constitute a settlement and/or release of any claims, causes of action, damages, restitution, fines, costs, attorneys' fees and/or penalties arising from any acts, issues, policies or practices which relate in any way to or are based upon DISH Network unilaterally altering, directly or through any Third-Party Retailers, the terms of any Agreement without the express written consent of the Consumer with whom it entered the Agreement, including, but not limited to, any alteration in any terms concerning programming or pricing in any long-term contracts, or which relate to or are based upon the inclusion in DISH Network's Agreement of any provision that permits its unilateral alteration, directly or through any Third-Party Retailers, of the terms of any Agreement concerning the purchase and/or lease of DISH Network Services and/or DISH Network Goods.

7.5     The titles and headers to each section of this Assurance are for convenience purposes only and are not intended by the parties to lend meaning to the actual provisions of the Assurance.

7.6     As used herein, the plural shall refer to the singular and the singular shall refer to the plural and the masculine and the feminine and the neuter shall refer to the other, as the context requires.

7.7     Subject to Paragraph 7.4, nothing in this Assurance shall limit the right of the Attorneys General to obtain information, documents or testimony from DISH Network pursuant to any state or federal law, regulation or rule.

7.8     Subject to Paragraph 7.4, nothing in this Assurance shall be construed to limit the authority of the Attorneys General to protect the interests or people of their State.

7.9     If any provision of this Assurance shall come into conflict with any newly enacted law or change in an existing law; there is a change in DISH Network's business practices; there are any changes or advancements in technology; or there are any other reasons that may be appropriate under the circumstances, the parties to this Assurance may modify this Assurance with the express written consent of all parties and court approval, if necessary.

7.10    Nothing in this Assurance constitutes an agreement by the Attorneys General concerning the characterization of the amounts paid hereunder for purposes of any proceeding under the Internal Revenue Code or any state tax laws.

30

7.11    No waiver, modification, or amendment of the terms of this Assurance shall be valid or binding unless made in writing and signed by the party to be charged and then only to the extent set forth in such written waiver, modification or amendment.

7.12    Any failure by any party to this Assurance to insist upon the strict performance by any other party of any of the provisions of this Assurance shall not be deemed a waiver of any of the provisions of this Assurance, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Assurance.

·7.13    If any clause, provision or section of this Assurance shall, for any reason, be held illegal, invalid or unenforceable such illegality, invalidity or unenforceability shall not affect any other clause, provision or section of this Assurance and this Assurance shall be construed and enforced as if such illegal, invalid or unenforceable clause, section or other provision had not been contained herein.

7.14    This Assurance sets forth the entire agreement between the Attorneys General and DISH Network resolving the allegations in paragraphs 1.5 through 1.12.[8]

7.15    Nothing in this Assurance shall be construed to waive any claims of sovereign immunity the Attorneys General or their States may have in any action or proceeding.

7.16    DISH Network will not participate, directly or indirectly, in any activity to form a separate entity or corporation for the purpose of engaging in acts prohibited in this Assurance or for any other purpose which would otherwise circumvent any part of this Assurance or the spirit or purposes of this Assurance.

7.17    If a signatory Attorney General determines that DISH Network has failed to comply with any of the terms of this Assurance, and if in the signatory Attorney General's sole discretion the failure to comply does not threaten the health or safety of the citizens of their State, the signatory Attorney General agrees not to initiate any action or proceeding pursuant to the Assurance against DISH Network based upon a dispute relating to DISH Network's compliance without first notifying DISH Network in writing of such failure to comply. DISH Network shall then have ten (10) business days from receipt of such written notice to provide a written response to the signatory Attorney General. Nothing in this Assurance shall be construed to limit the authority of the Attorneys General to protect the interests of their States or the people of their States. Further, subject to paragraph 7.4, nothing in this Assurance shall be construed to limit or bar the Attorneys General or any other governmental entity from enforcing laws, regulations or rules against DISH Network at any point in time.

---

[8]This Assurance of Voluntary Compliance will not have any effect on the Assurance of Voluntary Compliance or Discontinuance titled "In the Matter of: EchoStar Satellite Corporation" entered by thirteen states in 2003.

7.18    Nothing herein shall prevent the Attorneys General from agreeing to provide DISH Network with additional time beyond the ten (10) business day period to respond to the notice.

## 8. REPRESENTATIONS AND WARRANTIES

8.1    DISH Network represents and warrants that the execution and delivery of this Assurance is its free and voluntary act, and that this Assurance is the result of good faith negotiations.

8.2    DISH Network represents and warrants that signatories to this Assurance have authority to act for and bind DISH Network.

## 9. COMPLIANCE WITH ALL LAWS

9.1    Nothing in this Assurance shall be construed as relieving DISH Network of the obligation to comply with all state and federal laws, regulations or rules, nor shall any of the provisions of this Assurance be deemed to be permission to engage in any acts or practices prohibited by such law, regulation, or rule.

## 10. NONCOMPLIANCE

10.1    DISH Network represents that it has fully read and understood this Assurance and understands the legal consequences involved in signing this Assurance (including that in certain states, a violation of this Assurance is punishable by contempt, and in others, a violation of this Assurance is *prima facie* evidence of a violation of that State's consumer protection statute). DISH Network expressly understands that any violation of this Assurance may result in any signatory Attorney General seeking all available relief to enforce this Assurance, including an injunction, civil penalties, court and investigative costs, attorneys' fees, restitution, and any other mechanism provided by the laws of the state or authorized by a court.

## 11. MONITORING FOR COMPLIANCE

11.1    Upon request by any signatory Attorney General, DISH Network shall provide books, records and/or documents to the signatory Attorney General relating to compliance with this Assurance. DISH Network shall make any requested information related to compliance with this Assurance available within thirty (30) days of the request, by the signatory Attorney General. This shall in no way limit the signatory Attorney General's right to obtain documents, records, testimony or other information pursuant to any law, regulation, or rule.

11.2    Within thirty (30) days of entry of this Assurance, DISH Network shall submit a copy of this Assurance to each of its officers, directors, and any employee necessary to ensure DISH Network's compliance with the terms of this Assurance.

11.3    The Attorneys General have the right to test shop DISH Network for the purpose of confirming compliance with this Assurance and state law. The test shoppers are not required to disclose that they are representatives of the Attorneys General when making contact with DISH Network. Further, DISH Network hereby agrees that the Attorneys General may record any or all aspects of its solicitations or visit(s) with DISH Network in audio and/or video form without notice to DISH Network. DISH Network agrees to void any sale that is commenced by a test shopper and return any monies paid by a test shopper upon notification that it was test shopping conducted by the Attorneys General.

## 12. PRIVATE RIGHT OF ACTION

12.1    Nothing in this Assurance shall be construed to affect, restrict, limit, waive or alter any private right of action that a Consumer may have against DISH Network.

## 13. NOTIFICATION TO PARTIES

13.1    Any notices required to be sent to the Attorneys General pursuant to this Assurance shall be sent by United States certified mail, return receipt requested, or other nationally recognized courier service that provides for tracking services and identification of the person signing for the document. The documents shall be sent to the following addresses:

| For the State of | For DISH Network: |
|---|---|
| | R. Stanton Dodge<br>Executive Vice President and<br>General Counsel<br>9601 S. Meridian Blvd.<br>Englewood, CO 80112<br><br>cc:   Helen Mac Murray<br>Mac Murray, Petersen &<br>Shuster LLP<br>6530 West Campus Oval, Suite 210<br>New Albany, OH 43054<br>Telephone: (614) 939-9955 |

13.2   Any party may designate a different individual to receive the notices required to be sent by sending written notification to the other parties at least thirty (30) days before such change will occur identifying that individual by name and/or title and mailing address.

## 14.   COSTS

14.1   Where necessary DISH Network shall pay all court costs associated with the filing of this Assurance.

34

**In the Matter of:**
**Dish Network Assurance of Voluntary Compliance**

Dated: _7|2|09_

Troy King
Attorney General of Alabama


W. Rushing Payne, Jr.
Deputy Attorney General
Office of the Attorney General
500 Dexter Avenue
Montgomery, Alabama 36130
(334) 353-4951
(334) 242-2433 (fax)

FOR THE STATE OF ALASKA

DANIEL S. SULLIVAN
ATTORNEY GENERAL

By: _Davyn Williams_
Davyn Williams
Alaska Bar No. 0711093
Assistant Attorney General
Office of the Attorney General
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
(907) 269-5200

33

Assurance of Voluntary Compliance
In the Matter of Dish Network, L.L.C.

TERRY GODDARD
ATTORNEY GENERAL
FOR THE STATE OF ARIZONA

By: _Dona Ross Carter for Rebecca Salisbury_
Rebecca Salisbury
Assistant Attorney General

Date: _June 24, 2009_

34

FOR THE STATE OF ARKANSAS:

Jean C. Block
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
501.682.2108 Direct
501.683.1513 Fax

33

## ASSURANCE OF VOLUNTARY COMPLIANCE

In the matter of:

DISH NETWORK, L.L.C.,                    )
a Colorado Limited Liability Company     )


Agreed to and accepted by the State of Colorado, ex rel. John W. Suthers
This 8th day of July, 2009

> JOHN W. SUTHERS
> Attorney General
>
> _(signature)_
>
> ANDREW P. McCALLIN
> First Assistant Attorney General
> Consumer Protection Section
>
> 1525 Sherman Street – 7th Floor
> Denver, CO 80203
> (303) 866-5134
> FAX: (303) 866-4916
> Andrew.McCallin@State.CO.US
>
> Attorney for the State of Colorado

FOR THE STATE OF CONNECTICUT

RICHARD BLUMENTHAL
ATTORNEY GENERAL

By
        Brendan T, Flynn
        Assistant Attorney General
        Juris Number 419935
        Office of the Attorney General
        110 Sherman Street
        Hartford, CT 06105

In the matter of:

DISH NETWORK, L.L.C.,                    )
a Colorado Limited Liability Company     )

Signature Page

*FOR THE STATE OF DELAWARE:*

JOSEPH R. BIDEN, III
Attorney General of the State of Delaware

By: _____          Date: ___C/11/09___

Jeremy Eicher #5093
Deputy Attorney General
Delaware Department of Justice
Fraud and Consumer Protection Division
820 North French Street, 5th Floor
Wilmington, Delaware 19801
(302) 577-8600 (telephone)
(302) 577-6499 (facsimile)

33

BILL McCOLLUM
ATTORNEY GENERAL
STATE OF FLORIDA



Jack A. Norris, Special Counsel
Florida Attorney General's Office
Multistate Litigation
110 S.E. 6th Street
Fort Lauderdale, FL 33301
BAR no: 0364861
Date:     6 - 29 - 2009



Theresa Bland Edwards
Assistant Attorney General
Florida Attorney General's Office
Economic Crimes
110 S.E. 6th Street
Fort Lauderdale, FL 33301
BAR no.: 252794
Date: 7/1/09

FOR THE STATE OF GEORGIA

Joseph B. Doyle, Administrator
Fair Business Practices Act

Date: JUNE 10, 2009

In the Matter of
DISH NETWORK, L.L.C

Assurance of Voluntary Compliance

DATED: June 30, 2009

STEPHEN H. LEVINS, Executive
Director
Office of Consumer Protection of the
State of Hawaii

JEFFREY E. BRUNTON
Staff Attorney
Office of Consumer Protection
State of Hawaii
235 South Beretania Street, Suite 801
Honolulu, Hawaii 96813

FOR THE STATE OF IDAHO:

**LAWRENCE G. WASDEN**
ATTORNEY GENERAL FOR THE
STATE OF IDAHO

STEPHANIE N. GUYON
Deputy Attorney General
Office of the Idaho Attorney General
Consumer Protection Division
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2424
Facsimile: (208) 334-4151
Email: stephanie.guyon@ag.idaho.gov

FOR THE STATE OF INDIANA

Gregory F. Zoeller
Attorney General of Indiana


By: _____
    Jeremy R. Comeau
    Deputy Attorney General
    Atty. No. 26310-53
    Office of Attorney General
    Indiana Government Center South
    302 West Washington Street, 5th Floor
    Indianapolis, IN  46204
    317.232.6317
    jcomeau@atg.in.gov


542901

In Re: AVC with Dish Network, L.L.C.

For the Iowa Attorney General:


Date: June 23, 2009

William L. Brauch
Special Assistant Attorney General
Director-Consumer Protection Division

FOR THE STATE OF KANSAS:

_____
Emilie Burdette, KS Bar #22094
Assistant Attorney General
Consumer Protection Division
Office of Kansas Attorney General Steve Six
120 SW 10th Avenue
Topeka, Kansas 66612
(786) 296-3751

33

**DISH NETWORK – ASSURANCE OF VOLUNTARY COMPLIANCE
WITH COMMONWEALTH OF KENTUCKY**

APPROVED BY:

R. STANTON DODGE
Executive Vice President and General Counsel
DISH Network, L.L.C.
9601 S. Meridian Blvd.
Englewood, CO 80112


HELEN MAC MURRAY
SHAUN K. PETERSEN
Mac Murray, Petersen & Shuster LLP
6530 West Campus Oval, Suite 210
P.O. Box 365
New Albany, OH 43054
Telephone No.: (614) 939-9955
Facsimile: (614) 939-9954
Email: hmacmurray@mcpslaw.com
spetersen@mcpslaw.com
Counsel for DISH Network, L.L.C.



MARYELLEN B. MYNEAR
Litigation Manager/Assistant Attorney General
Office of the Kentucky Attorney General
Consumer Protection Division
1024 Capital Center Dr.
Frankfort, KY 40601
Telephone:  (502) 696-5389
Facsimile:  (502) 573-7151
Email:  maryellen.mynear@ag.ky.gov

FOR THE STATE OF LOUISIANA

JAMES D. "BUDDY" CALDWELL
Attorney General
State of Louisiana

By: _____
    L. Christopher Styron
    La. Bar Roll No. 30747
    Assistant Attorney General
    State of Louisiana
    Public Protection Division
    Consumer Protection Section
    1885 N. 3rd Street, 4th Floor
    Baton Rouge, Louisiana 70802
    (225) 326-6468

    Isabel Wingerter
    La. Bar Roll No. 20428
    Deputy Director, Public Protection Division
    Assistant Attorney General
    State of Louisiana
    1885 N. 3rd Street, 4th Floor
    Baton Rouge, Louisiana 70802
    (225) 326-6464

FOR THE ATTORNEY GENERAL, STATE OF MAINE

JANET T. MILLS
Attorney General

LINDA J. CONTI, Me. Bar No. 3638
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8591

FOR THE STATE OF MARYLAND

DOUGLAS F. GANSLER
ATTORNEY GENERAL

By:

_____
Philip D. Ziperman, Deputy Chief
Consumer Protection Division
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
(410) 576-6374

33

FOR THE COMMONWEALTH OF MASSACHUSETTS

*David W. Monahan*

David W. Monahan
Deputy Chief, Consumer Protection Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-727-2200, x. 2954
617-727-5765 (fax)

June 19, 2009

In the Matter of:

**DISH NETWORK, L.L.C.,**                    )
**A Colorado Limited Liability Company** )

                                MICHAEL A. COX
                                Attorney General of the State of Michigan

Dated:  June 18, 2009            By: _____
                                Kathy Fitzgerald (P51454)
                                Assistant Attorney General
                                Consumer Protection Division
                                P.O. Box 30213
                                Lansing, MI  48909
                                (517) 335-0855

FOR THE STATE OF MINNESOTA

LORI SWANSON
ATTORNEY GENERAL


By: _____

Jeffrey E. Grell (021078X)
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 215-6367

**In the matter of**
**DISH NETWORK, L.L.C.,**
**a Colorado Limited Liability Company**

Dated: June 19, 2009

JIM HOOD
Attorney General of the State of Mississippi

BY: BRIDGETTE W. WIGGINS
MSB No. 9676
Special Assistant Attorney General
Mississippi Attorney General's Office
Post Office Box 22947
Jackson, MS 39225
Phone:        (601) 359-4279
Facsimile:    (601) 359-4231

FOR THE STATE OF MISSOURI:

Victoria Lautman
Assistant Attorney General
Consumer Protection Division
1530 Rax Court
Jefferson City, MO 65109
Telephone: 573-751-3392
Facsimile: 573-751-7948
Victoria.Lautman@ago.mo.gov

33

days before such change will occur identifying that individual by name and/or title and

mailing address.

## 14.   COSTS

14.1   Where necessary DISH Network shall pay all court costs associated with

the filing of this Assurance.

**FOR THE STATE OF MONTANA:**

STEVE BULLOCK
Montana Attorney General

By: *Kelley L. Hubbard*
  KELLEY L. HUBBARD
  Assistant Attorney General

**APPROVED BY:**

_____
R.  STANTON DODGE
Executive Vice President and General Counsel
DISH Network, L.L.C.
9601 S. Meridian Blvd.
Englewood, CO 80112

_____
HELEN MAC MURRAY
SHAUN K. PETERSEN
Mac Murray, Petersen & Shuster LLP
6530 West Campus Oval, Suite 210
P.O. Box 365
New Albany, OH 43054
Telephone No.: (614) 939-9955
Facsimile: (614) 939-9954
Email:   hmacmurray@mcpslaw.com;
    spetersen@mcpslaw.com

Counsel for DISH Network, L.L.C.

56

STATE OF NEBRASKA
ATTORNEY GENERAL JON BRUNING

By: _____
      Leslie C. Levy
      Assistant Attorney General
      Nebraska Department of Justice
      2115 State Capitol Building
      Lincoln NE 68509
      402.471.2811

Date: _6·23·09_____

1

2

3   By:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CATHERINE CORTEZ MASTO
Attorney General

JO ANN GIBBS
Senior Deputy Attorney General
Nevada Bar No. 005324
555 E. Washington Avenue, #3900
Las Vegas, Nevada  89101
702-486-3789
Attorneys for Plaintiff, State of Nevada

33

STATE OF NEW HAMPSHIRE
Kelly A. Ayotte, Attorney General:

By:

Richard W. Head, NH Bar No. 7900
Associate Attorney General
33 Capitol Street
Concord, NH 03301
603-271-1248

In the matter of:
DISH NETWORK, L.L.C.
Assurance of Voluntary Compliance

Dated: June 19, 2009

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY

By: _Nicholas Kant_____
Nicholas Kant
Deputy Attorney General

Consumer Fraud Prosecution Section
124 Halsey Street – 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Telephone: (973) 648-4584
Fax: (973) 648-4887

In the matter of:

DISH NETWORK, L.L.C.,                )
a Colorado Limited Liability Company  )

For the State of New Mexico:
Gary K. King
Attorney General

By: *Lawrence Otero*
    Lawrence Otero
    Assistant Attorney General
    Office of the Attorney General
    P.O. Drawer 1508
    Santa Fe, NM 87504
    Ph: (505) 827-6704
    Fx: (505) 827-6685

Date: *18 June 2009*

FOR THE STATE OF NEW YORK

ANDREW M. CUOMO
Attorney General
By:

HERBERT ISRAEL
Assistant Attorney General

Dated: July  3 , 2009

In the matter of:

DISH NETWORK, L.L.C.
A Colorado Limited Liability Company


STATE OF NORTH DAKOTA

Wayne Stenehjem
Attorney General of North Dakota

Parrell D. Grossman, State ID No. 04684
Assistant Attorney General
Director
Consumer Protection & Antitrust Division
Office of Attorney General
PO Box 1054
4205 State Street
Bismarck, ND 58502-1054
(701)328-5570
(701)328-5568 (Fax)


Dated this 23rd day of June, 2009

**In the Matter of:**
**Dish Network, LLC Assurance of Voluntary Compliance**

Dated: __June 23, 2009__                   W.A. DREW EDMONDSON
                                           ATTORNEY GENERAL


                                           Julie A. Bays
                                           Assistant Attorney General
                                           Consumer Protection Unit
                                           313 N.E. 21st
                                           Oklahoma City, Oklahoma 73105
                                           Phone: (405) 522-3082
                                           Fax: (405) 522-0085

PATRICK C. LYNCH
ATTORNEY GENERAL
STATE OF RHODE ISLAND
By His Attorney

Edmund F. Murray, Jr.
Special Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext. 2401

1   In the Matter of:

2   DISH NETWORK, L.L.C., a Colorado Limited Liability Company.

3   Assurance of Voluntary Compliance

4   ## APPROVAL BY COURT

5   APPROVED for FILING and SO ORDERED this ___ day of _____, 2009.

6

7   _____
    Circuit Court Judge
    Marion County, State of Oregon

8

9   ## ACCEPTANCE OF DOJ

10  ACCEPTED this 30th day of June, 2009.

11                      JOHN R. KROGER
                        Attorney General for the State of Oregon
12

13          By: _____

14              Andrew L. Shull (OR Bar #024541)
                Assistant Attorney General
15              Oregon Department of Justice
                1162 Court Street, NE
16              Salem, OR 97301-4096
                andrew.shull@doj.state.or.us
17              (Appearance In Oregon Only)

18

19

20

21

22

23

24

25

26

End Page –ASSURANCE OF VOLUNTARY COMPLIANCE / [DN, LLC]
DM1477839-v1

In the Matter of:

**DISH NETWORK, L.L.C.**
a Colorado Limited Liability Company

**ASSURANCE OF VOLUNTARY COMPLIANCE**


**COMMONWEATLH OF PENNSYLVANIA**
**OFFICE OF ATTORNEY GENERAL**
**BUREAU OF CONSUMER PROTECTION**

**THOMAS W. CORBETT, JR.**
Attorney General


By: _____
   Thomas J. Blessington
   Senior Deputy Attorney General
   Pennsylvania Office of Attorney General
   Bureau of Consumer Protection
   21 South 12th Street, 2nd Floor
   Philadelphia, PA 19107
   (215) 560-2414

DATE: July 2, 2009

FOR THE STATE OF SOUTH CAROLINA:

MARY FRANCES JOWERS
Assistant Attorney General
Office of the South Carolina Attorney General
1000 Assembly Street, Room 519
Columbia, SC 29201
Phone: 803.734.3680
Fax; 803.734.3677
mfjowers@scag.gov

**In the Matter of:**
**Dish Network, L.L.C**


**FOR THE STATE OF SOUTH DAKOTA**

LAWRENCE E. LONG
ATTORNEY GENERAL

By:                                                    Date: 6/23/09

Jeffery J. Tronvold
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
(605) 773-3215 Telephone
(605) 773-4106 Facsimile

FOR THE ATTORNEY GENERAL, STATE OF TENNESSEE


**ROBERT E. COOPER, JR.**
Attorney General and Reporter
B.P.R. No. 10934


**JEFFREY L. HILL**
Senior Counsel
B.P.R. No. 16731
Office of the Attorney General
Consumer Advocate and Protection Division
Post Office Box 20207
Nashville, TN 37202-0207
Telephone (615) 741-2614
Facsimile (615) 532-2910

Date: 6-29-09

**COUNSEL FOR THE STATE OF TEXAS**

GREG ABBOTT
Attorney General of Texas

C. ANDREW WEBER
First Assistant Attorney General

DAVID S. MORALES
Deputy First Assistant Attorney General for Litigation

PAUL D. CARMONA
Chief, Consumer Protection Division
& Public Health Division

D. ESTHER CHAVEZ
State Bar No. 04162200
Consumer Protection & Public Health Division
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 475-4628
Facsimile: (512) 473-8301

We, the undersigned, have the authority to consent and sign on behalf of the parties in this matter, hereby consent to the form and content of the foregoing Assurance and to its entry:

Signed this 25th day of June, 2009. ·

FOR THE STATE OF UTAH:

MARK L. SHURTLEFF
Utah Attorney General


JEFFREY BUCKNER, USB #4546
Assistant Attorney General
Office of Utah Attorney General
Commercial Enforcement Division
160 East 300 South, Fifth Floor
P. O . Box 140872
Salt Lake City, UT  84114-0872
801-366-0310

34

FOR THE STATE OF VERMONT
ATTORNEY GENERAL WILLIAM H. SORRELL

Sarah E.B. London
Assistant Attorney General
Vermont Attorney General's Office
Public Protection Division
109 State Street
Montpelier, VT 05609-1001

Date: 6/22/09

34

In the Matter of
DISH Network, L.L.C.

Assurance of Voluntary Compliance

DATED: June 16, 2009

COMMONWEALTH OF VIRGINIA,
EX REL. WILLIAM C. MIMS,
ATTORNEY GENERAL

William C. Mims
Attorney General

Martin L. Kent
Chief Deputy Attorney General

Maureen R. Matsen
Deputy Attorney General
Civil Division

David B. Irvin
Senior Assistant Attorney General and Chief
Antitrust and Consumer Litigation Section

By: _____
Courtney M. Malveaux
Assistant Attorney General
(VSB No. 51064)
Antitrust and Consumer Litigation Section
Office of the Attorney General of Virginia
900 East Main Street, 6th Floor
Richmond, Virginia 23219
Telephone: (804) 786-1925
Facsimile: (804) 786-0122

FOR THE STATE OF WASHINGTON

ROBERT M. MCKENNA
Attorney General

KATHERINE M. TASSI WSBN 32908
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104

33

FOR THE STATE OF WEST VIRGINIA

CHRISTOPHER HEDGES (WV #7894)
ASSISTANT ATTORNEY GENERAL
Consumer Protection and Antitrust Division
Post Office Box 1789
Charleston, West Virginia 25326-1789
Telephone:   304-558-8986
Facsimile:    304-558-0184

FOR THE STATE OF WISCONSIN

J.B. VAN HOLLEN
Attorney General

*Nelle R. Rohlich*   Dated: 7/1/09

NELLE R. ROHLICH
Assistant Attorney General
State Bar No. 1047522

Attorneys for State of Wisconsin

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8901

33

BRUCE A. SALZBURG
Attorney General of Wyoming
123 Capitol Avenue
Cheyenne, WY  82002
(307) 777-7841 (telephone)
(307) 777-6869 (facsimile)

APPROVED BY:

_____
R. STANTON DODGE
Executive Vice President and General Counsel
DISH Network, L.L.C.
9601 S. Meridian Blvd.
Englewood, CO 80112


*Helen Mac Murray*
_____
HELEN MAC MURRAY
SHAUN K. PETERSEN
Mac Murray, Petersen & Shuster LLP
6530 West Campus Oval, Suite 210
P.O. Box 365
New Albany, OH 43054
Telephone No.:  (614) 939-9955
Facsimile: (614) 939-9954
Email:              hmacmurray@mcpslaw.com
                    spetersen@mcpslaw.com

Counsel for DISH Network, L.L.C.

EXHIBIT A

[Date]

[Consumer Name]
[Street Address]
[City, State, Zip]

    re:      Dish Network Complaint Resolution Program

Dear [Consumer Name]

       Pursuant to a settlement that was reached between Dish Network, L.L.C. ("Dish Network") and the Office of the [Insert State] Attorney General, we are offering you the restitution described below to settle the complaint that you filed against Dish Network concerning your satellite television service.  If you wish to accept the restitution offer described below, you do not need to do anything.  Dish Network will be providing you the below described restitution within forty-five (45) to seventy-five (75) days from the date of this letter.  If you wish to reject the restitution offer described below and request that a neutral third party administrator resolve your complaint against Dish Network, you must complete, sign, and mail the attached Claims Notice to Dish Network at the following address:

**DISH NETWORK CLAIMS RESOLUTION**
**[Street Address]**
**[City, State, Zip]**

**Description of Restitution Offer:**

_____

_____

37

If you have any questions, you may contact either the Office of the [Insert State Name] Attorney General at [Insert Contact Number] or you may contact Dish Network by calling [Insert Dish Network Contact Name and Title], at [Insert Contact Number].

Sincerely

[Dish Network Representative]

38

## CLAIMS NOTICE INSTRUCTIONS

If you wish to accept the restitution offer contained in the enclosed letter from Dish Network, you do not need to do anything. Dish Network will provide you with the restitution that is offered in its letter within 45 to 75 days from the date of the letter. If you wish to reject the restitution offer stated in the enclosed letter from Dish Network and to request that a neutral third party administrator resolve your complaint against Dish Network, you must complete, sign, and mail this Claims Notice to the Dish Network at the following address:

DISH NETWORK CLAIMS RESOLUTION

[Street Address]

[City, State, Zip]

The Claims Notice must be postmarked within forty-five (45) days of the date on the enclosed final offer letter from Dish Network. In addition to completing and signing the Claim Form, you should also include copies of any documents that you believe support your claim. If your Claims Notice is not received by the Claim Administrator by the deadline, or is found to be fraudulent, it will be rejected by the Claim Administrator.

If you submit a valid Claims Notice, your claim will be mediated by the Claims Administrator. The Claims Administrator will conduct a review of the claim and supporting documentation and may obtain additional information from Dish Network or request that you submit additional information. If necessary, the Claims Administrator may also conduct a hearing, which may be held by telephone at the request of any party, during which you may explain your claim. At the conclusion of the evaluation, the Claims Administrator will notify you of the resolution of your claim and will offer you any resolution he/she believes appropriate. The decision of the Claims Administrator will be final.

If you have any questions about this Claims Notice, please include them on a separate piece of paper and send them to the address listed above, or simply attach them to the Claims Form.

# CLAIMS NOTICE

### Print or Type
### Please Provide All Requested Information

## CONTACT INFORMATION

Name: _____     Phone: _____

Address: _____     Work Phone: _____

City: _____

State: _____ Zip Code: _____

Email: _____

## ACCOUNT INFORMATION

I purchased Dish Network equipment on the following date: _____ .

Where did you buy Dish Network equipment?

       From a Retail Store_____ Store Name _____ .

       Over the Internet_____ Web Site Name (if known)_____ .

       By 800 telephone number_____(yes/no)

What type of equipment did you purchase?_____ .

I purchased Dish Network service on the following date: _____ .

What service plan(s) did you purchase?_____ .

Please provide the account-holder name and the address at which Dish Network service is/was provided if different from above:

Name: _____

Address: _____

City: _____

State: _____ Zip Code: _____

39

Phone:_____

I canceled Dish Network service for this address on the following date (if applicable):_____.

**CLAIM**

(Explain)_____

_____

_____

_____

_____

Use additional pages if necessary.

I do not believe that the offer by Dish Network is sufficient to compensate me for my claim because:

_____

_____

_____

_____. Use additional pages if necessary.

I request the following relief:

_____

_____

_____

I have attached documents in support of my claim (Copies only. Original documents will not be returned):

[ ] Yes

[ ] No

# CERTIFICATION

By signing and dating this form, I attest that all information provided by me in this Claims Notice (and attachments, if applicable) is true and accurate to the best of my knowledge, information and belief.

_____         _____
Signed                              Dated

40